FILED
DEC 20 2002
Phil Lombardi, Clerk
U.S. DISTRICT COURT
02CV951 B (J)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

DAVID WAYNE STARKEY
an individual,

vs.

DAVID STRUCKMAN, an individual,
LORENZO LAMANTIA, an individual,
DANIEL ANDERSEN, an individual,
JOHN RIZZO, an individual,
SYNERGY PRODUCTIONS INTERNATIONAL, INC.,
A Missouri Corporation, and
PINNACLE QUEST INTERNATIONAL, INC., a Panama Company, and JOHN DOES NOS. 1 THROUGH 20, being defendants not yet named.

Case No.

## ORIGINAL COMPLAINT

Plaintiff, DAVID WAYNE STARKEY, by and through his undersigned attorneys, and for his Complaint, alleges as follows:

### Nature of the Action

1. This is an action to recover compensatory and punitive damages for the fraudulent and tortious conduct of defendants, to restrain defendants and their co-conspirators from engaging in tortious conduct in the future, and to compel defendants to disgorge the proceeds of their tortious conduct.

2. Defendants are engaged in an ongoing, organized, and orchestrated conspiracy to commit tax and securities fraud via the Internet and multi-level marketing arrangements

which have as their specific intent and purpose to incite members of the general public to violate the Federal tax laws through the establishment of bogus offshore trusts and the assertion in federal district and tax courts of discredited tax protester theories.  In all relevant respects, defendants have acted in concert with each other to further their fraudulent scheme.

3.  Beginning not later than September, 1996, defendants, their various agents and employees, and their co-conspirators formed a conspiracy with themselves and others to preserve and expand the market for illegal tax elimination products and to maximize the joint profits earned by defendants and their co-conspirators from the sale of said illegal products.  Each defendant has participated in the operation of the conspiracy and has committed numerous acts to maintain and expand the conspiracy.

4.  To evade discovery of their fraudulent conduct and to avoid the loss of profits resulting from such discovery, defendants have perpetrated an elaborate and organized scheme of deception, defamation, and harassment, aimed at discrediting and retaliating against the Plaintiff, who has become a strident public critic of the defendants' illegal activities, and causing the Plaintiff to suffer substantial injuries.

5.  The effect of defendants' fraudulent scheme and wrongful conduct continues to this day; defendants are continuing to profit and prosper from their unlawful and tortious conduct; and unless restrained by this Court, are likely to continue their fraudulent and unlawful conduct in the future.

## I. JURISDICTION

6. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). In addition, or in the alternative, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). The action concerns a disputed amount in excess of $75,000. Each defendant, individually and via the conspiracy, actively attempts to and does sell programs and materials nationwide, including in Oklahoma. Additionally, each defendant to this action maintains or participates directly or indirectly in an interactive website and in interstate conference calls soliciting participants nationwide, including Oklahoma and have actively engaged in business to and with residents of Oklahoma.

## II. VENUE

7. Venue is proper in the Northern District of Oklahoma pursuant to 28 U.S.C. §1391(b) because a substantial potion of the events from which this dispute arises and Plaintiff's claimed injuries occurred in the Northern District of Oklahoma.

## III. PARTIES

8. Plaintiff David Wayne Starkey, an individual, is a citizen of the State of Oklahoma. At all times material to this action, Starkey was a resident of Claremore, Oklahoma.

### A. Individual Defendants

9. Defendant DAVID STRUCKMAN is a citizen of the State of Washington.

10. Defendant LORENZO LAMANTIA ("Zo LaMantia" or "LaMantia") is a citizen of the State of California.

11. Defendant DANIEL ANDERSEN is a citizen of the State of Massachusetts.

12. Defendant JOHN RIZZO is a citizen of the State of Nevada.

**B. Corporate Defendants**

13. Defendant PINNACLE QUEST INTERNATIONAL, INC. ("Pinnacle Quest International" or "PQI"), is an alien business entity purportedly organized under the laws of Panama. PQI sells financial seminars and various tax elimination and asset protection strategies through its subsidiary or instrumentality, Synergy Productions International, Inc. ("Synergy Productions International" or "SPI"), a Missouri-based corporation formed and organized for the exclusive purpose of facilitating the sale of PQI products and services. SPI publishes and distributes PQI audio financial seminars through a network of agents whom SPI purports to register, supervise, and monitor. PQI and SPI were both formed and organized on or about July 1, 2002, by Defendant David Struckman, as successor entities to Non-Defendant Related Parties Global Prosperity and Educational Publishing Services, respectively.

**C. Non-Defendant Related Parties**

14. Global Prosperity, an organization or entity of unknown form, was formed and organized on or about September 1, 1996 by Defendants David Struckman, Zo Lamantia, and Daniel Andersen, for the purpose of selling financial seminars and various tax elimination and asset protection strategies. Global Prosperity is and was a criminal conspiracy to market, *inter alia*, discredited "tax protester" materials and similar bogus products. The current conspiracy defendants are engaged in is either the same conspiracy

or a whole or partial continuation of that conspiracy. Global Prosperity sold its products and services through Educational Publishing Services, ("EPS"), a Massachusetts-based company formed and organized directly or indirectly by Defendants Struckman, LaMantia, and Andersen, for the exclusive purpose of facilitating the sale of Global Prosperity products and services. Like its successor entity Synergy Productions International, EPS published and distributed products and services through a network of agents whom EPS purportedly registered, supervised, and monitored. Global Prosperity originally went by the name Global Prosperity Group ("GPG"), but changed its name to the Institute of Global Prosperity ("IGP") sometime during 1997. Global Prosperity and EPS are not currently named as defendants herein, although Plaintiff reserves the right to add Global Prosperity and EPS as defendants.

15. Stratia Corporation, LLC, a Nevada-based limited liability company with principal place of business in Massachusetts, was formed and organized on or about August 1, 2002, by Defendants LaMantia and Andersen, for the purpose of selling tax elimination and asset protection products, substantially similar to those offered for sale by Global Prosperity and Pinnacle Quest International. Stratia Corporation is not currently named as a defendant herein, although Plaintiff reserves the right to add Stratia Corporation as a defendant.

**D. "John Doe" Defendants 1-20**

16. "John Doe" Defendants 1-20 are persons or business entities not yet identified, not citizens or residents of Oklahoma, who have actively participated in, aided, and abetted the named defendants' conspiratorial scheme.

## IV. FACTS

### A. The Ever-growing Problem of "Tax Protester" Fraud

17. The problem of so-called tax protester fraud is one of the most serious problems facing society today. Appearing in a variety of different guises, thousands of con artists dupe hundreds of thousands of American citizens each year into believing that the con artist can provide a legal and foolproof way out of paying federal and sometimes state income taxes. These scams range from complex and prepared packages of documentation involving unreported offshore trusts and bank accounts to simple, but false arguments that businesses do not have to pay their employment and withholding taxes. Recent high-profile prosecutions by the Internal Revenue Service have done little to stem the ever-increasing, and increasingly lucrative, tide of illegal tax protest schemes and bogus offshore trusts. Estimates of the amount of revenue the U.S. Treasury loses as a direct result of these tax schemes ranges from $70 billion to $300 billion annually. Today, the problem of tax-protester fraud stands at an all-time high.

18. While many of these tax scams have been in existence for decades, the success and profitability of theses tax scams during the cyberage has been nothing short of phenomenal. In the words of Senator Charles E. Grassley before the Senate Finance Committee on April 5, 2001, "[t]ax scams are as old as the tax code. The Internet has given them new life. The number of participants in these tax scams is growing like a weed." Highly sophisticated technology, coupled with limited enforcement efforts of Federal prosecutors, has fueled a highly orchestrated movement of organized con artists

operating in a largely unregulated environment. Transmitting information at the speed of light, the Internet scam artist can reach every U.S. taxpayer with access to a computer. Websites operated by private individuals warning the public about the scams, while highly valuable, are outnumbered on a scale of 1,000 to 1 or better by websites of scam artists selling what many cyberscam experts call "high-tech snake oil".

19. One of the most popular Internet scams involves the use of a "Pure Trust" or "Constitutional Trust" to avoid the payment of Federal income taxes. Because these trusts do not themselves pay taxes (the taxes being reported and paid by the grantor), the scam artists falsely claim that these trusts may be used to avoid payment of income taxes altogether. One respected expert on offshore tax havens, Mr. Jack Blum, has estimated that there are $3 trillion of assets in offshore pure trusts and that the annual revenue loss to the Treasury is at least $70 billion. These trusts have never been recognized by any U.S. or state court as a means of avoiding payment of income tax, yet there have been and continue to be a myriad of promoters of these abusive trust structures.

20. Significantly, and unfortunately for American citizens, the Internet scam artists point to each other's websites to lend credibility to their own bogus claims regarding the use of these trusts as a means of avoiding income taxes, and ironically cite the government's own lack of enforcement in allowing these sites to operate as further proof that the scam artists must be right.

21. The Internet has made the scam industry more efficient by allowing scam artists to pitch their schemes to the masses while concealing their identities from government investigators. The Internet even allows the con artists to study the

government's response to the tax scams themselves, allowing the con artist to see what others are doing so they can fine tune their scams and stay one step ahead of the IRS.

22. The scam artists often count on the inability of the IRS to chase down money once it has left the country. Unless the scam is especially egregious, State prosecutors and regulators, with severely limited resources, rarely get involved. Testifying before the Senate Finance Committee about Non-Defendant Related Party Global Prosperity, Aaron Bazaar stated:

> "If somebody wants to steal from people, the Internet is the place to do it. The chances of getting caught, in my opinion are virtually nil. [Global Prosperity] has been stealing from people for 5 years now without any repercussions. They ignore Cease-and-Desist Orders because they know they can get away with it."

23. According to his sworn testimony before the Senate Finance Committee, Bazaar became involved with Global Prosperity after he answered an unsolicited bulk e-mail for a business opportunity. The e-mail said Bazaar could make thousands of dollars a week and learn how to legally eliminate taxes. Later, when he realized he had been scammed he reported the scam to his "state attorney general, the State attorney general of New Mexico, the FBI, the FTC, and anybody else who might listen." Despite Bazaar's efforts, he was told that nothing could be done because "it was the other state's problem, or it is the FBI's jurisdiction because [Global Prosperity] crosses state lines or it was a securities issue."

24. Another factor compounding the problem of effective government enforcement of laws prohibiting these Internet tax scams is the government's inability to locate the con artist once he has left the country. For example, Keith Anderson, founder of Investors International, another predecessor organization of Defendant Pinnacle Quest International, was able to escape the reach of Federal prosecutors for many years, hiding in the Caribbean until he was finally apprehended in Costa Rica earlier this year.

25. The success of Internet-based tax frauds means that many scam victims wind up believing that what they are doing is perfectly legal. Certified Financial Planner Ms. J.J. McNab, in testimony before the Senate Finance Committee stated:

> "Most of the taxpayers out there truly believe what they are doing works. They do not think they are cheating. They do not think they are evading. They think this is the way it is. This is the law. And I am doing the right thing."

**B.    Genesis and Development of the Global Prosperity/ Pinnacle Quest International Conspiracy to Defraud the Public and Violate Federal Tax Laws**

26. The Global Prosperity/Pinnacle Quest International tax fraud conspiracy is perhaps the largest and most notorious tax fraud scheme in history. Conceived in the mid-1990s by Defendants David Struckman, Zo LaMantia, and Daniel Andersen, Global Prosperity's fundamental goal was to preserve and expand the market for abusive offshore tax strategies and other illegal tax elimination tactics, through an aggressive campaign of deceit and disinformation, using the most sophisticated technological and marketing tools available. Because the Global Prosperity name had become synonymous

with tax fraud, on or about July 1, 2002, Defendant Struckman formed a new company, Pinnacle Quest International, to continue the scheme and carry out the conspiratorial goals. Products and services marketed by PQI and Global Prosperity are identical in every material respect. In addition to selling financial seminars, PQI, like its predecessor Global Prosperity, promotes product and services offered for sale by so-called third-party vendors. Products sold by these vendors and available exclusively to PQI (or Global Prosperity) clients include the IRS Codebusters package, the Sixteenth Amendment Reliance Defense package, and the tax statement package. *See, infra, Sections IV D, E, and F* (tax statement package, Reliance Defense package, and IRS Codebusters package, respectively). During its 6-year existence, PQI purports to have sold approximately 100,000 financial seminars and other products, all promoting the idea that the Federal income tax system is voluntary and unconstitutional and that clients may legally avoid payment of Federal income taxes using defendants' methods.

27. The Global Prosperity/PQI tax fraud scheme is part of a much larger conspiracy encompassing numerous other promoters and sellers of illegal tax elimination products, all seeking to maximize the conspirators' joint profits from the sale of said products. On information and belief, the number of co-conspirators is at least 10,000 and includes, at a minimum, owners and operators of more than 1,000 Internet websites promoting or selling abusive tax shelters and other illegal tax elimination products and services. The constituent members of the conspiracy are aware that unless they act in concert, the joint profits from the sale of said illegal tax elimination programs would substantially decrease. Said co-conspirators utilize the Internet or world wide web to

provide a uniform voice to help propagate their false statements regarding the alleged tax benefits from participating in their illegal tax elimination programs, to ensure that said co-conspirators remain at least one step ahead of government authorities, and to ensure that said co-conspirators continue to act in concert. *See, infra, Section V F* (describing the conspiracy and utilization of the Internet to further conspiratorial goals).

28. The Global Prosperity/PQI/Stratia conspiracy operates on three distinct levels. On the broadest level stands an overarching conspiracy involving numerous leaders of the tax protester movement, including individuals such as Lynne Meredith and former IRS agent Joe Bannister, as well as organizations such as Innovative Financial Consultants. *See, for example*, www.quatloos.com/lynne_meredith_indicted_for_tax_fraud.html (describing a 35-count indictment against Lynne Meredith after more than seven years of successfully marketing bogus offshore trusts). These individuals and organizations promote and market illegal tax programs by collaborating and cross-marketing so much bogus material that unsuspecting victims are comforting into believing that their discredited theories are valid. For example, several tax protester organizations, including Global Prosperity, have distributed a report prepared by former IRS agent Joe Bannister, falsely claiming that the Federal income tax is voluntary or unconstitutional. See, www.freedomabovefortune.com. Central to the success of this overarching conspiracy is the conspirators' frequent utilization of the Internet as the principal channel of communication to ensure that the conspirators continue to espouse the party line and continue to employ the most effective market strategies currently available to sell their

bogus products and theories. One of the most popular and successful marketing strategies involves falsely claiming that the tax protester's theories have been accepted by courts of law. *See, for example*, www.i-f-c.com (fraudulently claiming that pure trusts established by Innovative Financial Consultants may be used to legally avoid payment of income taxes and that these trusts have successfully withstood at least 23 civil suit challenges).

29. On a second level stand the organizational Defendants and Related Parties PQI, Global Prosperity, and Stratia Corporation, and their various predecessor organizations, spin-off organizations, and agents, directly connected with these Defendants and Related Parties. These conspirators, several of whom are unknown to Plaintiff, have marketed and continue to market, financial seminars and other materials fraudulently claiming that the purchaser may become legally tax-exempt using the conspirators' methods. On the third level is the conspiracy to conceal the truth about the conspirators' bogus products by engaging in an organized pattern of tortious conduct designed to discredit and retaliate against Plaintiff Starkey and thereby preserve and expand the market for the conspirators' illegal tax programs.

30. Using carefully crafted scripts, defendants' aggressive and well-funded advertising campaigns target several groups of prospective clients, from wealthy professionals seeking to protect assets in offshore tax havens to poor unemployed workers wishing to work their way out of poverty and live the great American dream. PQI uses sophisticated marketing techniques to identify those people most likely to be receptive to its message, often preying on the poor, the vulnerable, and anyone seeking

to make a dramatic change in his life.  To these individuals, PQI promotes itself as a business opportunity promising lavish financial rewards available to anyone who can implement a "turnkey" system.

31. In achieving their phenomenal scamming success, Global Prosperity/PQI has perpetrating some of the most blatant falsehoods imaginable to lend credibility to their bogus tax elimination products, including the placing a 9-page full-color advertisement in Tycoon magazine and falsely representing that the ad was actually an objective feature article authored by a journalist at the magazine.  The advertisement, which appeared in the Fall 2000 issue of Tycoon magazine, touted Global Prosperity's alleged rags-to-riches success stories and its ability to "get information that is exclusive to the ultra-wealthy ... to the average person."

32. Pinnacle Quest International's most brazen acts involve the services of PQI vendor Kenneth Wayne, a non-attorney who frequently masquerades as an attorney on national teleconference calls and before courts of law.  Wayne variously describes himself as a "Federal lawyer," "Federal attorney," "Federal bar lawyer," "Federal bar attorney," or "member of the Federal bar association and the international bar association."  In fact, Wayne has no formal legal training and has never been admitted to the bar of any state.

33. Wayne has even posed as an attorney in court.  On March 20, 2002, Wayne filed an action on behalf of David Struckman against Federal Magistrate Ricardo Martinez, alleging that Martinez improperly issued a search warrant against Struckman, a sovereign citizen whose premises were outside a "Federal area."  The complaint was filed

by Struckman and Wayne "in his official capacity as Attorney-in-Fact for the interests of David Struckman." In dismissing the action *sua sponte*, Chief Judge John C. Coughenour of the Western District of Washington at Seattle noted that "all of Wayne's previous filings have been dismissed as frivolous. All of Mr. Wayne's and [Wayne's associate] Mr. Stephenson's terminated actions, thirty (30) to date, have been dismissed as frivolous. In those actions, Mr. Wayne and Mr. Stephenson have, among other things, attempted to recover on state-law liens improperly placed on the property of public officials; to remove criminal prosecutions and civil actions to federal court where there was no legal basis for so doing, and to represent private parties or corporations although they are not attorneys." *See, Exhibit 1, Complaint for Declaratory Judgment, Wayne, et al. v. Martinez, and Order dismissing the case sua sponte*. Despite Wayne's unbroken pattern of failures, he continues to flout the court system. His action against Martinez is currently on appeal with the Ninth Circuit Court of Appeals (Docket # 02-35707).

34. Global Prosperity, like its successor entity PQI, marketed its products through a multi-level marketing program or pyramid scheme that has been deemed a violation of state securities law by at least one State Securities Division. *See, Exhibit 2, Final Order of the Commonwealth of Massachusetts, Office of the Secretary of the Commonwealth, Securities Division*, (finding that Global Prosperity programs are investment contracts or securities under Massachusetts General Laws and ordering Global Prosperity to cease and desist selling such programs). On information and belief, Defendants Struckman, LaMantia, and Andersen were aware of but completely ignored this Cease-and-Desist Order of the Massachusetts Securities Division and established PQI

and Stratia Corporation in part because of the negative publicity surrounding this Cease-and-Desist Order. *See, also, supra, Section IV A* (Bazaar comments regarding the lack of enforcement of state Cease-and-Desist Orders).

35. Defendants Struckman, LaMantia, and Andersen have consistently and repeatedly flouted the judicial system and displayed a callous disregard for our nation's already thin judicial resources. In addition to ignoring the aforementioned Massachusetts Cease-and-Desist Order, Defendants LaMantia and Andersen, like Defendant Struckman, have unsuccessfully sued agents of the Federal government for allegedly conducting improper searches and seizures in connection with defendants' fraudulent tax elimination products. *See, Exhibit 3, Daniel Andersen, et al. v. United States, et al.*, (9th Cir unpub July 30, 2002) (Case No. 01-56900).

36. On or about August 1, 2002, Defendants LaMantia and Andersen formed Stratia Corporation, a Nevada-based corporation, for the purpose of selling tax elimination and asset protection products substantially similar to those offered for sale by Global Prosperity and PQI. Among other promotional activities, Stratia Corporation publishes the "Stratia Wire," a promotional newsletter distributed free of charge to prospective clients of Stratia Corporation's financial seminars. Recent issues of the Stratia Wire have asserted false or misleading statements that the current Federal income tax system is both illegal and unconstitutional. Defendants Andersen and LaMantia hold the official titles of CEO and Chairman of the Board of Stratia Corporation, respectively.

C.    **Pinnacle Quest International's Consultant Agreement**

37. Pinnacle Quest International markets its financial seminars and illegal tax elimination programs through a network of thousands of agents dispersed throughout the 50 states and Canada. These agents, known as "Qualified Consultants," are purportedly registered, supervised, and monitored by Synergy Productions International, Inc. ("SPI" or "Synergy Productions International"), a Missouri-based instrumentality of PQI organized for the exclusive purpose of facilitating the sale of Pinnacle Quest International products, in accordance with SPI's consultant agreement ("Consultant Agreement").

38. In accordance with the Consultant Agreement, Synergy Products International Consultants market PQI products and services under SPI's direction and control, at fixed prices, with the Consultant's compensation paid on a percentage or commission basis, and with SPI retaining the right to terminate the Consultant's employment at any time and for any reason. PQI and SPI exercise complete control over the manner by which PQI products are marketed. A PQI client can only become a Qualified Consultant after completing a period of supervised training under the direction of a Qualified Consultant. Further, the marketing and promotion of any products in conjunction with the PQI product line without prior express permission of SPI is strictly prohibited, as is any use if the names "Pinnacle Quest International," "PQI," "Synergy Productions," or "SPI." Internet advertising and group teleconferencing for the purpose of marketing PQI products is also strictly prohibited without prior express written permission from PQI. Significantly, testimonials concerning the successful implementation of PQI products or strategies must be based on personal first-hand

experience only, unless authorized beforehand by SPI or PQI.  This latter restriction provides a strong incentive to the Consultant to implement PQI tax elimination and asset protection strategies himself if he hopes to become a successful marketer.

**D.  Pinnacle Quest International's Promotional Websites**

39. Qualified Consultant Mark D. Leitner owns and operates the website www.geocities.com/betaxexempt/betaxexempt.html  ("Leitner  Website")  promoting Pinnacle Quest International products and services.  *See Exhibit 4, Leitner Website.*  The representations made on the Leitner Website are representative of claims made by PQI Qualified Consultants generally.  Leitner purports to provide clients with "expert tools" and ongoing "consultation" on "how to legally zero their tax liability" using "6 different methods to help the client become tax free."  In an introductory section of the website, Leitner states that "PQI has provided it's [sic] products and services to nearly 100,000 people" and that after "6 years of success, we continue to grow stronger."  The reference to "100,000 people" over a 6-year period necessarily includes clients of predecessor entity Global Prosperity.  Leitner boasts that PQI provides strategies previously available only to "the ultra-wealthy and well-connected," and that the client may become tax-free for the rest of his life "Legally, Ethically, Irrefutably, [and] Professionally."

40. In a separate section of the Leitner Website, Leitner features photographs of people identified as "PQI contributors," including Congressman Ron Paul and ex-IRS agents Joe Bannister, Sherry Jackson, and John Turner.  For those visitors of the Leitner website who remain "skeptical," Leitner utilizes cyberage multi-media technology to allow the visitor to download and listen to "powerful testimonials on the reality of

becoming tax exempt." Among the testimonials is one featuring a CPA in Atlanta whose "mother is an IRS agent" and whose "aunt is an IRS auditor," claiming that 85% of Americans may become legally tax-exempt by filing a tax statement in lieu of a tax return. The CPA also contends that the tax statement marketed by PQI is "absolutely foolproof" according to both the aforementioned mother and aunt, and that there is no statutory obligation for most Americans to file or pay Federal income tax. Other testimonials feature "Les in DC" who reportedly became convinced that taxes are voluntary for most Americans after researching the issue with "the IRS head attorney," and an "Ex-Police Officer" who purports to have saved over $120,000 in back taxes by filing for refunds for all past tax years since 1991.

      41. In a standalone document that Leitner e-mailed to prospective clients during August and September of 2002 and bearing the heading "Pinnacle Quest Programs, Benefits, and Services," Leitner repeatedly boasts that PQI's tax elimination programs have enjoyed "complete success" over a period of 15 years or more. For example, one program, Leitner identifies as the "Millennium 2000 Package," a program available exclusively to PQI customers, is "comprised of Former Judge John Rizzo, Attorney Warren Richardson (former attorney to Senator Orin [sic] Hatch), Attorney Jerry Rillo, and other experts" and uses the "exhaustive research of former revenue agent Bill Benson" to "walk away clean[ly]" from the tax system. The Millennium 2000 Package is based on Benson's research allegedly showing that the Sixteenth Amendment to the Constitution, granting Congress the power to impose the current Federal income tax system, was never properly ratified. According to Leitner this "information has [a]

15-year track record of complete success." Another program, based on filing the aforementioned tax statement in lieu of a tax return, has "not been challenged or received negative results from the IRS in over 17 years." In another section of the document, Leitner again refers to Congressman Ron Paul, promoting Paul's own government website and referring to Paul as someone who has been a featured speaker at "our seminars."

42. Other Pinnacle Quest International promotional websites contain similar representations and testimonials conveying the impression that PQI products are based on closely guarded secrets, have never failed, and are endorsed by an elite group of experts including a sitting United States Congressman and three former IRS agents. For example, the official PQI website, www.pqi.cc ("PQI Website"), references Congressman Paul's official government website www.house.gov/paul, under the heading "Resources and Links." By clicking on Paul's web address from within the PQI Website, the visitor is taken directly to Paul's government website in a manner strongly suggesting that Congressman Paul endorses PQI products and services. A photographic likeness of Congressman Paul appears immediately below the Pinnacle Quest International logo. To the right of Congressman Paul's likeness are the words "I am pleased to host this website as a service ... for Americans everywhere who cherish the ideals of liberty, fiscal integrity, and constitutional government."

43. By pulling Congressman Paul's entire webpage and incorporating it bodily beneath the Pinnacle Quest logo, PQI is using the United State's government's own bandwidth to hotlink Congressman Paul's official government website with the Pinnacle

Quest logo, with the United State's Treasury paying for the data transfer. As if to add insult to injury, PQI has found a way to use the Federal government's own resources to promote an illegal tax elimination product, further draining the Treasury of revenue. *See Exhibit 5, Ron Paul Website.*

44. Like the Leitner Website, the PQI Website uses sophisticated multi-media technology to access testimonials of satisfied PQI clients to reinforce the themes that PQI's methods are foolproof, based on little-known secrets, and endorsed by an elite team of professionals. One such testimonial by a woman identified as a retired attorney in Vermont, states that PQI seminars convey "the truth, as provided in the law, but not necessarily publicized." Another testimonial, by a man identified as "Jon from Illinois," claims that Jon relishes his PQI education because his "attorneys and accountants even with all of their education never knew this information existed." Throughout the many testimonials, as throughout PQI materials in general, the reader or listener is urged to distrust attorneys and other professionals outside Pinnacle Quest International, who are often portrayed as woefully ignorant and sorely in need of the education offered by PQI. Another PQI testimonial, by a woman identified as "Linda in Hawaii," gleefully recounts her experience involving litigation "inspired by an attorney who thought he could reach [her] assets," only to discover that Pinnacle Quest International's asset protection strategies have rendered her completely judgment-proof. In yet another testimonial, an unidentified speaker boasts that PQI vendor Kenneth Wayne, the same individual who frequently masquerades as an attorney on PQI teleconference calls and in litigation, was

able to help the speaker after both her attorney and CPA told the woman her situation was hopeless.

45. The cumulative message of these PQI marketing materials is clear: PQI tax elimination and asset protection strategies are endorsed by a blue ribbon panel of experts, including attorneys, CPA's, three former IRS agents, and even a sitting United States Congressman, that their methods are based on secrets heretofore known only to the very wealthy, and that it is both unnecessary and even inadvisable to consult with attorneys or other tax professionals outside Pinnacle Quest International.

## E. Pinnacle Quest International's Illegal Tax Elimination Programs – Sixteenth Amendment Reliance Defense Package

46. Beginning in 1999 and continuing to the present, Global Prosperity/PQI has promoted a package falsely alleging that the purchaser could legally avoid payment of income tax on the ground that the Sixteenth Amendment to the Constitution was never properly ratified and that as a consequence, the Federal income tax system is voluntary. Global Prosperity promoted this package, known, as the Sixteenth Amendment Reliance Defense package, through vendors Bill Benson and John Rizzo, who made the package available exclusively to Global Prosperity clients. Starkey purchased the package from Benson after reviewing a commercial videotape featuring John Rizzo describing the operation and implementation of the Reliance Defense package.

47. The original commercial videotape was part of a larger collection of four videotapes from a live seminar at Camp David. In addition to explaining the operation of Benson's Sixteenth Amendment package, the tapes featured an overview of the history of

Global Prosperity, a power marketing session with motivational coach Mike Conaway, and an interview with David Struckman. One tape featured Struckman appearing before a small audience and explaining how easy it is to become a success in the business. "First become a product of the product. Start implementing these strategies." "You know how I would go about selling somebody? I'd go up to Mike and say 'Mike, are you sick and tired of paying taxes? Yes or No? How would you like to do something about it instead of just complaining? How about not paying anymore? How about seeing what you can legally and lawfully do and going to this website? Take a look at what Bill Benson has done.'"

48. The videotape describing the implementation of the Reliance Defense package begins with David Struckman appearing before a small audience in what closely resembles a TV talk show format and introducing a man identified as "Judge John Rizzo." Elsewhere, on the Global I audio seminar, Rizzo is misleadingly described as a former judge who once made a career "working within the system, interpreting the Internal Revenue Code." In fact, Rizzo, a man who has never attended law school or been admitted to the bar of any State, was never more than a traffic judge and is believed to have no judicial experience whatsoever interpreting the Federal tax laws.

49. On the videotape, Rizzo goes on to say that although it is not widely known, the Sixteenth Amendment to the Constitution, granting Congress the power to impose the current Federal income tax, was never properly ratified. Rizzo identifies himself as someone "trained in the law," and states that in his professional legal opinion, because the Sixteenth Amendment was never ratified, the Federal income tax is in fact

voluntary and "if you choose not to volunteer, that's certainly within your right."  For those wishing to de-tax themselves, Rizzo states that he is going to show the audience how to use the research of Bill Benson, principal author of *The Law That Never Was*, "to walk away from the IRS forever.  Very quietly, very legally, very cleanly."

50. Rizzo admits that at one time, U.S. Attorneys tried to prosecute non-filers raising a Sixteenth Amendment defense, and that Benson himself was once successfully prosecuted, but that these prosecutions are a thing of the past since the Seventh Circuit Court of Appeals told the lower court that there was "no law to violate."  Explaining the Seventh Circuit decision in the Benson case, Rizzo states that "if you go to court and you're put on trial and the jury finds you innocent, that simply means you didn't commit the crime.  But when you go to the Seventh Circuit Court of Appeals and they reverse your conviction because they say there was no crime to commit, that's all the difference in the world.  There is no crime."  Rizzo asserts unequivocally that Federal prosecutors have never prosecuted anyone raising a Sixteenth Amendment defense since the Benson conviction was reversed.  "They simply won't touch it."

51. Rizzo explains the basic operation of the Sixteenth Amendment Reliance Defense as follows: the package contains in excess of 17,000 documents allegedly proving that the Sixteenth Amendment was never properly.  These documents may be turned over to the IRS or government prosecutors in the relatively rare event that the IRS decides to pursue the non-filer for back taxes.

52. Rizzo then hectors the attorneys in the audience about the proper interpretation of the "exculpatory evidence rule."  "Bill knows this. Most of the attorneys

in this room know this. At least they should. The exculpatory evidence rule says, in essence, that if a prosecutor prosecuting a case has any knowledge of, possession of, any witnesses, any testimony or any documents which may be used to acquit the defendant of the crime for which he is charged, he is bound to make that information available not only to the defense, but to the jury."

53. Rizzo avers that reason the Sixteenth Amendment Reliance Defense package has been so effective is that the consequences of the IRS pursuing a taxpayer raising this defense are likely to be quite severe. Introduction of the evidence allegedly showing the improper ratification of the Sixteenth Amendment would allow the jury to invalidate not only the Amendment itself but also the entire Federal income system. Because "fraud vitiates every contract ... anybody who was taken in by the fraud becomes whole. [They] all get refunds. From 1913."

54. Rizzo goes on to state that the package may be used for any past tax year since 1913.

55. The statements John Rizzo made on the aforementioned videotape have no basis in law or fact.

56. Rizzo's representation that the Seventh Circuit Court of Appeals reversed Benson's conviction and announced to the lower court that "there was no law to violate," a clear reference to the title of Benson's book *The Law That Never Was*, is blatantly false. Although the Seventh Circuit reversed Benson's conviction, their reversal had nothing to do with the validity of the Sixteenth Amendment; the Seventh Circuit in fact affirmed the lower court's ruling denying Benson an evidentiary hearing on the validity of the

Sixteenth Amendment and reiterated the court's unbroken line of precedent that the Amendment was valid.  What the Seventh Circuit actually said was this:

> " ... Benson insists the district court should have at least granted him an evidentiary hearing on the Sixteenth Amendment issue. Benson is wrong.  In *Thomas*, we specifically examined the arguments made in *The Law That Never Was*, and concluded that 'Benson ... did not discover anything.'  We concluded that Secretary Knox's declaration that sufficient states had ratified the Sixteenth Amendment was conclusive, and that 'Secretary Knox's decision is now beyond review.'  See 788 F.2d at 1254.  It necessarily follows that the district court correctly refused to hold an evidentiary hearing; no hearing is necessary to consider an issue that is 'beyond review.'"  *United States v. Benson*, 941 F.2d 598, 607 (7th Cir. 1991).

57. On remand, Benson was retried, reconvicted, and reimprisoned.

58. Rizzo's representation that the "exculpatory evidence rule" mandates the introduction of all exculpatory evidence in a jury trial is also false.  The "exculpatory evidence rule," an apparent reference to the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, is a rule of pre-trial discovery, not evidence admissibility.  There exists no rule of evidence that requires admission of evidence merely because the evidence is exculpatory.  In proclaiming that the 17,000 physical documents must be admitted to the jury, Rizzo conveniently ignores the

strictures of Federal Rule of Evidence 403, which is often invoked successfully by prosecutors to prohibit the physical introduction of evidence that may confuse the jury or cause unnecessary delay. *See, for example, United States v. Nash*, 175 F.3d 429 (6th Cir. 1999) (holding that no rule of evidence requires "the physical introduction into evidence of documents comprising hundreds of pages") (citing *United States v. Gaumer*, F.2d 723, 725 (5th Cir. 1992).

59. Rizzo currently markets a package that is identical in every material respect as the package that Starkey purchased from Benson in 1999. On national teleconference calls as recently as August, 2002, Rizzo again boasted that his package has never failed and that he himself has used it successfully for 15 years. Yet documents filed with the United States Bankruptcy Court for the District of Nevada in 1997 show this claim to be false. According to documents filed with the Bankruptcy Court on October 28, 1997, Standing Trustee Kathleen MacDonald disbursed an amount in excess of $284,000 to the IRS for unpaid back taxes for the years 1986-1988 and 1994-1996, years for which Rizzo claims to have implemented his package successfully to get the IRS "out of his life forever."

60. Mr. Starkey purchased the Sixteenth Amendment Reliance Defense package from Benson in September of 1999, after viewing the Rizzo videotape and discussing the package with David Struckman, Bill Benson, and John Rizzo, each of whom assured Starkey of the package's unbroken string of successes. Included in the package was a videotape of a man identified as "Gary Phillips." Phillips states on the videotape that he is a member of the justice department, that because of Benson's

research it is now beyond serious dispute that the Sixteenth Amendment was never properly ratified, and that although Phillips has not paid taxes in many years, the IRS has never bothered him. But, seven months prior to Starkey's purchasing the Reliance Defense package, Phillips was served with a Bill of Information for five counts of willful failure to file. Benson, who played an active role in Phillips' case, was aware that Phillips was being prosecuted when Benson sold the package to Starkey in September, 1999. Phillips was convicted by a jury on all five counts in January, 2000 after less than a day of deliberations. Today, Benson continues to market a version of the Sixteenth Amendment Reliance Defense package that is identical in every material respect to the one Benson sold Starkey in 1999. Benson has, however, dropped the Phillips' videotape, or any other mention of Gary Phillips from his current package.

61. In November, 1999, during a teleconference call with attorney Larry Becraft and with Benson on the line, Becraft informed Benson that Benson's package could not possibly work because the matter was beyond review and that the documents would never be admitted in court.

62. Despite each of the aforementioned facts, the scam continues. As recently as October of 2002, on national conference calls, Benson continues to maintain that his package has never failed, that the documents allegedly proving the improper ratification are admitted in all courts in the country, and that no one using this package has had to pay Federal income tax, the latter statement being confirmed by PQI Consultant Claudia Hirmer.

**F. The Continuing Threat – Pinnacle Quest International's IRS Codebusters Package**

63. IRS Codebusters is the most popular tax elimination package currently available to PQI clients. The vendors of this package, which is available exclusively to existing PQI clients, are David Struckman's brother Robbie Struckman, Sharon Kukahn, and Kenneth Wayne (collectively "the vendors" or "IRS Codebusters"). Through a combination of videotapes, online law libraries, and national teleconference calls, the vendors purport to provide "irrefutable proof" that the Federal income tax system is voluntary for most Americans. Specifically, the vendors contend that taxes are voluntary for all Americans except those with "foreign-sourced income" under 26 U.S.C. § 861, or those engaged in Alcohol, Tobacco, or Firearm ("ATF") activities under Title 27 of the United States Code.

64. The vendors base their frivolous claim that taxes are voluntary for most Americans on what has been called the "§ 861 argument" or the "US sources argument." The § 861 argument falsely posits that a Treasury regulation promulgated under IRC § 861 (301 CFR § 1,861-8(f))) provides the exclusive list of sources of income subject to Federal income tax. Because that list is narrow, and focuses on foreign income of US citizens and similar international tax issues, the vendors assert that US-sourced income earned by US citizens is not subject to income taxation. IRS Codebusters has modified the traditional § 861 argument by combining the argument with a decoding package and by falsely claiming that the IRS routinely "corrupts" Individual Master Files ("IMF's") by posting bogus entries on every taxpayer's IMF using a secret code. These false

postings purportedly create a tax liability where none previously existed by incorrectly identifying the taxpayer as having foreign-sourced income or engaging in ATF activities.

65. The § 861 argument has been rejected out of hand by every judge that has considered it, beginning as early as 1993 in *Solomon v. Commissioner* 66 T.C.M. (CCH) 1201, 1993 WL 444615 (1993). The Tax Court reiterated its rejection of the § 861 argument in *Aiello v. Commissioner*, TC Memo 1995-40, 69 T.C.M. (CCH) 1765, 1995 WL 33282 (1995), and as recently as 2001 in *Furniss v. Commissioner*, TC Memo 2001-137, 81 T.C.M. (CCH) 1741, 2001 WL 649000 (2001). The Tax Court has sanctioned at least three taxpayers for asserting the position, imposing $5,000 penalties against taxpayers in *Solomon* and *Williams v. Commissioner*, 114 T.C. 136 (2000), and a $25,000 penalty against another taxpayer in *Darlow T. Madge v. Commissioner*, Tax Court Docket No. 01-1531.

66. IRS Codebusters recruits clients by offering to decode the taxpayer's IMF using "confidential IRS administrative manuals" and to correct the false postings. For a fee ranging from $3,030 to $4,775, the vendors offer to prepare Freedom of Information Act requests to obtain the client's IMF, to decode the IMF and identify the false entries, and to prepare a rebuttal letter instructing the IRS to correct these false postings. The vendors claim that correction of these false postings "exonerates" the taxpayer from any liability to file or pay Federal income taxes. IRS Codebusters boasts that its client list includes employers who no longer withhold federal income tax from wages on the ground that the employers have paid no wages subject to income tax, and individual taxpayers who have used their services to claim (improper) refunds.

67. IRS Codebusters promotes its services through videotapes, digital recordings, and national teleconference calls.  The vendors recruit clients by, *inter alia*, falsely representing their own legal credentials, falsely representing the program's success rate and length of existence, and falsely representing that the courts and even the IRS itself accepts their position as valid.

68. Four nights a week, vendors Robbie Struckman and Sharon Kukahn lead national teleconference calls using a state-of-the-art teleconferencing system.  On information and belief, this teleconferencing system cost in excess of $1,000,000 to construct and is capable of supporting in excess of 1,000 callers at a time.  These calls sometimes feature a third vendor identified as Kenneth Wayne, who is variously referred to as a "federal lawyer", "federal attorney", "federal bar lawyer", "federal bar attorney", or "member of the federal bar association and the international bar association." Struckman and Kukahn have also represented themselves as "federal lawyers" or "federal attorneys" on conference calls as recently as October, 2002.  None of these three vendors has ever been admitted to the bar of any state.

69. As with other PQI programs, prospects are urged to distance themselves from their current tax professionals, who are usually portrayed as woefully ignorant.  To drive home this message, IRS Codebusters distributes a promotional videotape entitled "Theft by Deception," created and produced by long-time tax protester Larken Rose. Using advanced computergenic animation techniques, the videotape portrays a three-dimensional animated figure bearing the initials "CPA" sitting in what appears to be a law library and searching in vain for the statutory obligation to file or pay income taxes

while repeatedly shaking his head in disbelief.   During the 60-minute videotape, the viewer is greeted to a lengthy disquisition on the history of the Federal income tax, ultimately concluding that Congress imposed a very limited tax due to strict Constitutional limitations on the Congressional power to tax.

70. Rather than communicate with their current tax professional, whom the vendors assert (correctly) is likely to be caught off guard by the § 861 argument, prospects are encouraged to prove the vendors wrong by using Cornell University's online law library to conduct electronic searches of the United States Code and regulations to locate the so-called liability statute, the definition of the word "individual," and the exclusive list of specific sources subject to the income tax.

71. Conference calls often end with vendors Struckman or Kukahn attempting to recruit clients by referring the prospect to a bogus reward offer made by Freedom Law School.  These vendors allege that Freedom Law School has offered to pay $50,000 to anyone who can prove that there exists a statutory obligation to file or pay Federal income tax, but that no one has ever been able to collect on the offer.  In reality, the Freedom Law School offer repeats, but misstates, the bogus reward offer made earlier by tax protester Bill Conklin.  Conklin's offer is couched as an offer to pay $50,000 to anyone who can prove "to Conklin" that there exists no such obligation to pay Federal income tax.  The inclusion of the words "to Conklin" (and their omission by Freedom Law School and IRS Codebusters) is the key to understanding the bogus nature of the supposed reward offer.  Courts considering the issue have interpreted Conklin's bogus reward as an offer to pay a person a sum of money if the person can change Conklin's

mind regarding the supposed absence of a statutory obligation to pay the tax. *See, Walder v. Conklin*, (D. Wyo. unpub December 13, 2001) (Case No. CV-01-1038); available from Conklin's website at www.anti-irs.com. The offer has no bearing whatsoever on whether the taxpayer may become legally tax exempt using IRS Codebusters' methods.

72. Beginning in September, 2002, IRS Codebusters has begun promoting its products using a taped interview, available to prospects directly from the vendors, featuring vendor Struckman interviewing former IRS revenue agent Sherry P. Jackson. Jackson, a Certified Public Accountant and former Certified Fraud Examiner, claims she is now convinced that taxes are voluntary for most Americans after having personally conducted a painstaking investigation of the Code and regulations. Jackson claims that although she originally planned to collect on the Freedom Law School $50,000 reward and "was all ready to spend the money," she was forced to change her view after conducting her investigation of the Code and later decided to join a movement promoting her new-found "truth" to the general public. Jackson also claims to be convinced that the "confidential administrative manuals" Struckman and Kukahn purport to use to decode Individual Master Files are the genuine manuals used by the IRS to encode the IMF to begin with.

73. To lend credibility to their frivolous § 861 arguments, vendors Struckman and Kukahn have made frequent references to websites espousing nearly identical arguments and to marketers selling similar programs, as recently as September and October of 2002. In addition to the aforementioned Freedom Law School website,

vendors Struckman and Kukahn have referred prospects to a strikingly similar program identified as the "Taxbusters" program and marketed by vendors supposedly unaffiliated with PQI or IRS Codebusters, as evidence that the vendors' § 861 and IMF arguments must be correct.

74. Although there exist several websites documenting the consistent failure of the § 861 argument, including www.quatloos.com, the vendors attempt to paper over the information reported on these websites through a calculated pattern of blatant falsehoods. On one conference call in October, 2002, the accurate information regarding this discredited argument reported on Quatloos site was dismissed as "basically a bunch of garbage" because the website "uses words in a misleading manner" by exploiting people's "misunderstanding of what those words mean." On that same conference call, vendor Struckman also falsely represented that the Quatloos website was an arm of the government, that IRS Codebusters was currently under litigation with the owner of the Quatloos website, and that Codebusters was suing Quatloos on three counts.

75. Vendors Struckman and Kukahn attempt to silence the more persistent skeptics by falsely claiming their program has had a 17-year track record of complete success. Based on their supposed first-hand experience, these two vendors falsely allege to have decoded more than 10,000 IMF's over a 17-year period, and that during that time, no client has ever had to go to court or been forced to pay income tax. Each of these claims is false. Based on individual employment records, as well as information communicated directly to the Plaintiff, the program has only been in existence since 1999

and no Codebuster vendor had ever attempted to decode an Individual Master File prior the program's inception in 1999.

76. Defendant David Struckman himself has become actively involved in promoting IRS Codebusters. As recently as November, 2002, Defendant Struckman has falsely represented on national telephone calls that Struckman himself has used the package successfully since 1994 and that a Federal court in Alabama had accepted the § 861 argument in a case involving a taxpayer named "Roy Waters," a man Struckman identified as an IRS Codebusters' client. Each of these claims is false. No court of record has ever accepted the § 861 argument. Moreover, the program has only been in existence since 1999. Consequently, Defendant Struckman could not have implemented the program in 1994.

## G. Plaintiff David Starkey's Involvement with Global Prosperity and David Struckman

### 1. Starkey encounters Global Prosperity and David Struckman

77. Plaintiff David Wayne Starkey was born and reared in Claremore, Oklahoma, where he has resided for most of his adult life. He has a limited formal education, having gotten no farther than the eighth grade. In 1993, at the age of 34, Mr. Starkey suffered an automobile related head injury from which he continues to suffer to this day. In 1995, he was diagnosed by a psychologist and a neurologist as being afflicted with certain cognitive impairments believed to be related to this head injury, including severely impaired reading comprehension skills. According to Starkey's 1995 psychological evaluation, Starkey is unable to read more than one or two pages at a time

and falls in the bottom one percent of the general population in reading comprehension skills.

78. Although Mr. Starkey is poorly educated, he has a special talent for direct sales. In January, 1997, Starkey had his first encounter with Global Prosperity. That month, Starkey attended a conference call during which Global Prosperity marketers trumpeted the "extraordinary" money-making opportunities available at Global Prosperity by selling what were described as financial educational seminars. The financial seminars were said to explain significant tax reduction strategies unknown to most Americans. At the time, Mr. Starkey was looking for a way out of poverty. The conference call featured testimonials of retailers claiming to be making "serious money" by following a "turnkey system" developed by the country's leading marketing experts. Starkey found these testimonials powerful and convincing. Later that month, Starkey joined Global Prosperity and ordered the Global 1 audio seminar, the first of three levels of financial seminars offered by Global that Starkey would eventually purchase, by sending in a cashier's check for $1,250. Starkey sold his color television set to raise the necessary funds.

79. As it turned out, the tax reduction strategies described in the audio seminar were based largely on arguments that the Federal income tax is voluntary and unconstitutional, combined with various strategies by which one could "legally" avoid paying income tax using offshore trusts. Starkey believed this material was completely accurate and decided to retail the audio seminars, listening to every marketing training call and following everything he was told to do to the letter.

80. Starkey achieved immediate success marketing Global Prosperity's audio seminars and became elated at the amount of money he was earning.  In early 1997, Starkey was introduced to Global Prosperity co-founder David Struckman.  From the beginning, Struckman represented himself as an international expert on legal tax elimination strategies and told Starkey that by working with Struckman, Starkey could learn secrets that heretofore were known only to the very wealthy.  Struckman soon became aware of Starkey's head injury and related mental infirmities.  Struckman told Starkey that he would work with Starkey personally if he agreed to step up to Global 2, a live 3-day seminar held semi-annually and featuring several "expert" speakers discussing the asset-protection and tax reduction benefits available through offshore investing. Starkey's attendance at the live seminar carried the additional benefit of allowing Starkey to market the Global 2 seminar and earning a commission of $5,000 per Global 2 sale. The Global 2 seminars retailed for $6,250.  Struckman explained that the "real money" in the business came from marketing the Global 2 seminars.  Starkey agreed to step up to Global 2 and purchased the seminar from Struckman for $6,250.

81. The seminar proved to be an exhilarating experience, with many positive people claiming to be making big money and living the great American dream. Struckman continually stressed during both live presentations and on marketing conference calls, that to be optimally successful in the business, a retailer needed to be a "product of the product," that he needed to implement the strategies himself to experience first-hand how effective these tax elimination strategies really were.  Struckman went to great lengths to win Starkey's trust and confidence and agreed to be Starkey's personal

mentor if he would agree to join the "Global 3 Bridge Club," an exclusive investment club offering investment opportunities available only to Global 3 members. A Global 3 membership retailed for $18,750.

82. Beginning in April, 1997 Struckman began to cultivate an extremely close relationship with Starkey. The two would go out eating together and dancing afterward. Struckman introduced Starkey to Global Prosperity's other top leaders. Struckman sometimes drew attention to Starkey's mental infirmities, stating that "you don't need a Harvard education to market this product. If Starkey can do it with his head injuries, anyone can." In May, 1997, Starkey agreed to join the Global 3 Bridge Club and accepted Struckman as his personal mentor regarding the implementation of Global Prosperity's supposedly legal tax elimination strategies and offshore investments.

### 2. Congressman Ron Paul Joins Forces with Global Prosperity and David Struckman

83. During 1997 and 1998, Starkey continued to market Global Prosperity products and continued attending the live Global 2 seminars on offshore investing. Throughout this entire period, Starkey continually listened to national teleconference calls hosted by people identified as tax experts telling the callers that there was no statutory obligation to file or pay income tax.

84. In June, 1998, Starkey attended a live Global 2 seminar in Aruba featuring Congressman Ron Paul as the principal guest speaker. Starkey witnessed first-hand Paul's onstage acceptance of a check from the three Global Prosperity founders, David Struckman, Zo LaMantia, and Daniel Andersen, a check Starkey understood was a

contribution to Paul's reelection campaign. Paul remained at the seminar following his speech, soliciting and receiving numerous campaign contributions from the seminar attendees. Earlier, Struckman had told Starkey that he believed Ron Paul's connection with Global Prosperity would help spearhead Global Prosperity's most successful marketing campaign. Struckman told retailers, including Starkey, that Paul's affiliation with Global Prosperity, an affiliation Struckman believed would continue long after the Aruba seminar ended, would lend substantial credibility to Global Prosperity's methods and should be used by retailers to help silence any skeptics that the retailer may encounter.

85. As it turned out, Struckman was right. Congressman Paul's affiliation with Global Prosperity, and later PQI, would continue long after the Aruba seminar ended. Following Paul's speech at the offshore seminar, Starkey continued to receive contribution solicitations directly from Paul's office via electronic mail. Starkey naturally believed that Congressman Paul supported Global Prosperity's tax elimination methods because Starkey's only connection with Paul was Starkey's attendance at the Aruba seminar and Starkey's membership in Global Prosperity. Global Prosperity leaders began circulating numerous e-mails urging Global Prosperity members to contribute to Paul's reelection campaign. In these e-mail communications, Global Prosperity leaders repeatedly described Paul as "one of us," as one of the few members of Congress who was willing to tell the truth about the illegality of the Federal income tax.

86. One such e-mail exchange circulated by Global Prosperity leaders is especially significant. It involved an exchange between Congressman Paul and a

prospective campaign contributor. By letter dated May 12, 1998, a man identified as Ken Weiland wrote Paul offering to contribute $1,000 to his campaign if Paul would "take to the Congressional floor, and offer $50,000 to anyone who can identify the law that makes anyone liable for income taxes!" Weiland boasted that "[m]illions of knowledgeable people, myself included, stopped paying taxes because there is no law. IT'S VOLUNTARY!" The e-mail exchange also contained Paul's response to Weiland, dated May 18, 1998 stating that Weiland "was right about the code." Global Prosperity leaders circulated this exchange to Global Prosperity members, including Starkey, calling Paul "the taxpayers' best friend," and "a man who speaks the truth about taxes."

87. Congressman Paul continued to promote Global Prosperity's illegal tax elimination products and in late 1998 agreed to do an audio taped interview to help promote the Global Prosperity 2001 continuing education series. The taped interview featured a man identified as Johnny Liberty asking Paul a series of questions. The most noteworthy point in the interview occurred when Congressman Paul reiterated his long-standing belief that the current Federal income tax system is illegal, just as Global Prosperity contended it was.

88. Congressman's Paul's substantial involvement with Global Prosperity had a profound effect on Starkey's beliefs. Starkey had witnessed Paul's apparent willingness to lend respectability to Global Prosperity, his apparent willingness to help market Global Prosperity tax elimination products, and his apparent willingness to accept campaign contributions from Global Prosperity leaders, seminar attendees, and others, all with Paul's full knowledge that all of these people professed a belief that taxes were

voluntary. While Congressman Paul's substantial involvement with Global Prosperity was not relevant to Starkey's initial decision to implement Global Prosperity strategies and market Global Prosperity products, Paul's involvement nevertheless fortified Starkey in his belief that taxes were voluntary and made it easier to accept the claims of "Judge" John Rizzo regarding the Sixteenth Amendment Reliance Defense package. *See, supra, Section IV E* (Reliance Defense package).

89. Pinnacle Quest International continues to use Ron Paul's connection with Global Prosperity and PQI to help market PQI products and services. Congressman Paul is expressly identified as a PQI contributor on material distributed by PQI Consultants Mark Leitner and Don Robert. In exchange for Paul's promotional assistance, PQI Consultants advertise Paul's recorded telephone address, targeting a population of wealthy professionals and others who are likely to be receptive to Paul's views and therefore likely to contribute to his campaign. On information and belief, Congressman Paul has been notified in writing on several occasions about PQI's ongoing use of Paul's name and likeness to help market illegal tax elimination products. As of the date of the filing of this Complaint, PQI's promotional use of Congressman Paul's affiliation with PQI continues.

### 3. **Starkey is Forced to Plead Guilty to a Misdemeanor Count Because of his Association with Global Prosperity**

90. In September, 1999, Starkey purchased the Sixteenth Amendment Reliance Defense package from Global Prosperity vendor Bill Benson. *See, supra, Section IV E*. The package is based on Bill Benson's research alleging that the Sixteenth

Amendment to the Constitution, allowing Congress to impose the current Federal income tax, was never properly ratified. Starkey had already heard about the alleged improper ratification of the Sixteenth Amendment from earlier Global Prosperity seminars. The Benson package was specifically intended for people who had been approached by the IRS and who wished to establish a defense against any threatened civil or criminal action. Starkey had earlier been threatened by an Assistant U.S. Attorney for misdemeanor willful failure to file for the year 1994.

91. Starkey has consistently maintained his innocence of the 1994 willful failure to file charge, based on a letter Starkey wrote to the IRS in April, 1995. On April 13, 1995, before the filing deadline for the 1994 tax year, Starkey dispatched a handwritten letter to the IRS stating that the documents necessary to complete his filing were not in his possession and requesting the assistance of the IRS in completing Starkey's return. The letter specifically requested the IRS to write to Starkey at the given address to instruct him as to what steps needed to be undertaken to complete his return. Starkey also indicated in the letter that he had read somewhere that the IRS assisted people in Mr. Starkey's situation.

92. Although Starkey believed he was innocent of the willful failure to file charge, he also believed what Struckman and Rizzo had told him earlier; that implementing the Sixteenth Amendment Reliance Defense package would be the cleanest way of disposing of the government's threatened prosecution. Struckman insisted he would prove to Starkey and the rest of Global Prosperity that Rizzo and Benson were

right: the government knows that the Sixteenth Amendment was never properly ratified and that the government would drop its case once Starkey raised the defense.

93. Struckman was wrong. On November 19, 1999, Starkey was served with a bill of information for misdemeanor willful failure to file for the year 1994. On or about that same date, Starkey attended a teleconference call at his attorney's office, with Bill Benson and Lowell (Larry) Becraft, a man identified as an attorney to Benson and an expert on the Sixteenth Amendment defense. Becraft put out all of Starkey's hopes of ever using the defense. Becraft told Starkey with Benson on the line, that (1) the Sixteenth Amendment defense was beyond review and could no longer be argued in court, and (2) the documents purportedly showing the improper ratification of the Sixteenth Amendment could not be admitted in court.

94. Although Starkey clearly lacked the mental state requirement for the willful failure to file charge, he pled guilty to this charge after Assistant U.S. Attorney Susan Morgan threatened to file charges for felony tax evasion, referencing Starkey's employment with Global Prosperity, a group she deemed to be a "tax protester organization." Potentially facing a lengthy prison sentence, David Starkey, a father of three, capitulated and decided to plead guilty to the misdemeanor charge despite his professed innocence. When the plea agreement was executed, Morgan insisted on a stipulation in the agreement mandating that Starkey serve time in prison. An earlier version of the plea agreement, proposed prior to Morgan learning of Starkey's association with Global Prosperity, did not contain this stipulation. Acceptance of the earlier plea agreement would have made Starkey eligible for probation and would have imposed a

maximum sentence of six months, two months fewer than the sentence Starkey would eventually serve. Nevertheless, Starkey rejected the earlier proposed plea agreement because he believed he was innocent.

95. Starkey was sentenced to a term of confinement in the Federal Correctional Facility at El Reno. He was released from El Reno Federal prison on May 3, 2001, having served approximately eight months in the facility.

### 4. Struckman and his Co-conspirators First Threaten then Defame Starkey Causing Him to Suffer Severe Humiliation and Emotional Distress

96. Following Mr. Starkey's sentencing hearing, there ensued a series of verbal threats and acts of vandalism against Starkey and his property by David Struckman and his co-conspirators. Prior to Starkey's scheduled confinement in El Reno Federal Prison, Struckman himself called Starkey and told him he would "have problems" if he went public with the truth that Global Prosperity programs do not work, threatening Starkey by telling him he "knew where his family lived." Starkey was flooded with harassing phone calls, many of them anonymous, purportedly from members of Global Prosperity, to the point that he needed to install a separate unlisted phone line. Starkey took Struckman's threats very seriously. One day, Starkey left his home in Claremore, Oklahoma to find that all four tires of his Trans Am were flat and the letters "I.G.P." written on the windshield. Because he believed that his family would be in immediate physical danger and because Starkey would be unable to protect them while he was in prison, Starkey decided to keep quiet until after his release.

97. Following Starkey's release from El Reno Federal Prison, David Struckman renewed his threats against Starkey by calling him and telling him he "had better keep quiet if he knew what was good for him." Several months went by. Although Starkey took Struckman's threats seriously, he also believed many people would be harmed if Starkey did not get the word out that following Global Prosperity's advice could land them in prison. Starkey told his story to the San Diego Tribune in October, 2001 and posted a version of his story on Starkey's own website www.igpfraud.com ("IGP Fraud Website").

98. On information and belief, Starkey's story led to the return of hundreds of Reliance Defense packages by dissatisfied purchasers demanding full refunds.   To counteract Starkey's completely accurate story appearing on the IGP Fraud Website, David Struckman and his co-conspirators fabricated a collection of false and defamatory statements and posted them on a website www.therealstory.tv ("Real Story Website"), leased to Global Prosperity Retailer Claudia Hirmer.  Under a section entitled "How to Respond to Anyone who Mentions David Starkey," David Struckman and his co-conspirators attempt to denigrate Starkey's character by falsely claiming that Starkey made up a pack of lies in order to extort money from his former business associates at Global Prosperity. The most blatant falsehoods on this website are: (1) that Starkey did not purchase the Reliance Defense package from a Global Prosperity vendor as he claimed, (2) that no one connected with Global Prosperity told him the package would work for a past tax year, and (3) that Starkey was terminated from Global Prosperity for stealing money from them.

99. The actual facts are these:     (1) Starkey purchased the Sixteenth Amendment Reliance Defense package from Bill Benson, the program's current vendor and has a customized letter from Benson dated September 28, 1999 to prove it.  Benson himself told Starkey in October, 2002 that he would be willing to verify Starkey's purchase to anyone who asked him.  (2) Starkey was expressly told by John Rizzo, David Struckman, and Bill Benson that the package would work for any past tax year and would work in Starkey's situation in particular.  Rizzo made the statement on a commercial videotape.     (3) Starkey resigned his employment from Global Prosperity by correspondence drafted by his attorneys and filed with the Federal District Court for the Northern District of Oklahoma.  There is no truth whatsoever to the claim that Starkey ever tried to steal money from Global Prosperity or that his employment was terminated by them.

100.       Despite having experienced severe emotional distress, repeated harassment, and denigration and defamation of his character, Starkey is attempting to put the pieces of his life back together.  Starkey is currently employed as a marketer of self-improvement courses and personal development seminars.

**5.       Conclusion**

101.       The atrocities visited upon Starkey at the hands of Global Prosperity should not be suffered by anyone in our society.  David Starkey is not now and never has been a tax protester, but rather a victim of a slickly marketed tax protest scam. Starkey has never recommended any tax elimination package, whether marketed by

Global Prosperity or anyone else, since resigning his employment from Global Prosperity. Starkey plays no role in politics. According to Starkey's own psychological evaluation, he cannot read more than two pages at a time. He is not a "patriot" in any sense of the term. He joined Global Prosperity in the sincere belief that he was entering a legitimate business enterprise that could help him work his way out of poverty. His simple philosophy is summarized on Starkey's own website, www.igpfraud.com. "If you are in Global Prosperity, get the hell out." "Global Prosperity might try to smear me personally, but if I can keep one person from going through what I went through, then it's worth it to come forward and tell the truth." And whatever else you do, "FILE YOUR TAXES" (emphasis supplied).

## V. CLAIMS FOR RELIEF

### A. Count One: Fraud (Fraudulent Misrepresentation, Concealment, Nondisclosure, and Deceit)

102. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 101 above as if fully set forth herein.

103. Defendants and their co-conspirators have engaged in a consistent course of conduct through which they have fraudulently misrepresented and misled broad segments of the general public, including Starkey, about the legality of the Federal income tax, the validity of the Sixteenth Amendment to the Constitution, the use of offshore trusts to legally stop paying income tax, and the success rate of programs marketed or endorsed by the defendants and Global Prosperity.

104. Beginning in February, 1997, and continuing throughout Starkey's employment with Global Prosperity, Defendant David Struckman made numerous

misrepresentations of fact, misrepresentations of law, partial disclosures, half-truths, and misleading statements, either orally to Starkey directly or via a commercial videotape that Starkey purchased from Global Prosperity, including each of the following:

      a. falsely representing that the Federal income tax system was voluntary for most Americans in general and for Starkey in particular;

      b. falsely representing that Starkey could legally stop paying taxes through the use of offshore trusts;

      c. falsely representing that Bill Benson's contention that the Sixteenth Amendment to the Constitution was never properly ratified had been accepted by the courts;

      d. falsely representing that each of the programs marketed by Global Prosperity through its vendors or described on Global Prosperity audio seminars had a record of complete success; and

      e. falsely representing or misleadingly suggesting that Defendant John Rizzo was a former Federal judge with judicial experience in interpreting the Internal Revenue Code.

      105.     Beginning some time in 1999, and continuing throughout Starkey's employment with Global Prosperity, Defendant John Rizzo made several misrepresentations of fact, misrepresentations of law, partial disclosures, half-truths, and misleading statements either orally to Starkey directly or via a commercial videotape that Starkey purchased from Global Prosperity, including each of the following:

a. falsely representing or misleadingly suggesting that the Seventh Circuit Court of Appeals reversed Bill Benson's convictions for willful failure to file and tax evasion because they agreed with the claims made in Benson's book, *The LawThat Never Was*, that the Federal income tax system is unconstitutional;

b. falsely representing that Federal prosecutors have not prosecuted any taxpayer claiming the Sixteenth Amendment was never properly ratified since Benson's convictions were reversed by the Seventh Circuit Court of Appeals even though Benson himself was reprosecuted, retried, reconvicted, and reimprisoned for these identical offenses;

c. falsely representing that the information contained in Bill Benson's Sixteenth Amendment Reliance Defense package claiming that the Sixteenth Amendmentwas never properly ratified had enjoyed an unbroken track record of complete success when the Sixteenth Amendment argument has failed repeatedly in each and every instance the argument has been raised in Federal court;

d. falsely representing that most Americans in general and Starkey in particular could legally avoid the payment of Federal income tax for any year past or present since 1913;

e. falsely representing that the "exculpatory evidence rule" mandated the admission in a criminal jury trial of the documentary evidence contained in Bill Benson's Sixteenth Amendment Reliance Defense package even

though courts routinely exclude such evidence on the ground that introduction of said documentary evidence would be likely to confuse or mislead a jury;

f. falsely representing that a jury in criminal trial was empowered to invalidate and nullify the Federal income tax laws and compel the Federal government to issue refunds to all taxpayers since 1913;

g. falsely representing that because a jury in a criminal trial has the power to invalidate the Federal income tax system, no Federal prosecutor has prosecuted a taxpayer raising a Sixteenth Amendment defense in over ten years; and

h. falsely representing that Rizzo himself has legally avoided paying Federal income tax since 1986 using the information contained in Bill Benson's packagewhen in 1997, a bankruptcy trustee paid the IRS more than $284,000 on a claim for unpaid back taxes during this period.

106. Each of the representations identified in paragraphs 104 and 105 above was material.

107. On several occasions during Starkey's employment with Global Prosperity, Defendant David Struckman represented to Starkey (a) that Struckman had superior knowledge regarding the legality of the Federal income tax and the use of offshore trusts to legally stop paying taxes and (b) that it was both unnecessary and even inadvisable to consult with an attorney outside Global Prosperity regarding these matters.

108.     Beginning in February, 1997 and continuing throughout Starkey's employment with Global Prosperity, Defendant David Struckman repeatedly represented to Starkey that to be optimally successful in marketing Global Prosperity seminars, Starkey needed to be "a product of the product," and needed to "walk the walk and talk the talk." Struckman intended these statements to mean, and Starkey interpreted them to mean, that Starkey needed to implement the tax elimination strategies himself in order to market Global Prosperity seminars successfully and work his way our of poverty.

109.     Starkey relied on each of the representations identified in paragraphs 104 and 105 above by implementing Global Prosperity tax elimination strategies and by marketing Global Prosperity seminars. Each of the representations was intended to induce such reliance.

110.     At the time that these false or misleading representations were made, defendants and their co-conspirators knew or should have known that these statements were materially fraudulent, false, or misleading, and they intentionally omitted or concealed material information. Additionally, or in the alternative, defendants and their co-conspirators made the statements recklessly with conscious disregard for the truth or falsity of the representations.

111.     In April of 2000, Starkey accepted a plea agreement for willful failure to file Federal income taxes for the year 1994. He served an eight-month prison sentence in El Reno Federal prison following his plea conviction. Starkey could not have been convicted for this or any other offense connected with Starkey's confinement in El

Reno Federal prison but for Starkey's reliance on representations made by David Struckman and John Rizzo identified in paragraphs 104 and 105 above.

112.    In the alternative, Starkey would not have served time in prison or would not have served as long a period of confinement but for Starkey's reliance on representations made by David Struckman and John Rizzo identified in paragraphs 104 and 105 above.

113.    As a direct and proximate result of Starkey's reliance on the representations identified in paragraphs 104 and 105 above, Starkey has suffered, and continues to suffer, damages including emotional distress, mental pain, mental anguish, humiliation, reputational damage, loss of friendship, lost income, and consequential and incidental damages.

114.    At all times material to this action, each of the defendants was both mutual agent of, and co-conspirator with, each of the other defendants.

115.    At all times material to this action, each of the defendants ratified the fraudulent misrepresentations of the other defendants by accepting the financial benefits of Starkey's reliance and by committing numerous acts in furtherance of the conspiracy as described elsewhere in this Complaint.

116.    At all times material to this action, each of the defendants had access to superior information regarding the representations identified in paragraphs 104 and 105 above.

117. Starkey did not know, and could not have known through the exercise of reasonable diligence, that the defendants had committed actionable fraud against him until his release from El Reno Federal prison on May 3, 2001.

**B. <u>Count Two: Fraud in Connection with a Criminal Defense (Fraudulent Misrepresentation, Concealment, Nondisclosure and Deceit in Connection with a Criminal Defense)</u>**

118. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 117 above as if fully set forth herein.

119. Starkey purchased the Sixteenth Amendment Reliance Defense package from Global Prosperity vendor Bill Benson, during the course of plea negotiations with Federal prosecutors, to protect Starkey's liberty interest and to avoid any possible civil or criminal sanctions for alleged willful failure to file Federal income taxes for the year 1994. Starkey has always maintained his complete innocence of this charge. Starkey purchased the Reliance Defense package in reliance on representations made by Defendants John Rizzo and David Struckman identified in paragraphs 104 and 105 above.

120. As a direct and proximate result of Starkey's reliance on the representations identified in paragraphs 104 and 105 above, Starkey has suffered, and continues to suffer, damages including emotional distress, mental pain, mental anguish, humiliation, reputational damage, lost income, and consequential and incidental damages.

C. **Count Three: Defamation (Libel, Cyberlibel, and Cybersmear) and Count Four: Intentional Interference with Prospective Economic Advantage (Malicious Interference with a Business Relationship)**

121. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

122. At some time following October 7, 2001, Defendants David Struckman, Zo Lamantia, and Daniel Andersen, devised a scheme and artifice whereby these three defendants and their co-conspirators would circulate false and defamatory statements regarding Starkey's exposé of Global Prosperity appearing on Starkey's website www.igpfraud.com. It was part of said scheme and artifice that defendants and their co-conspirators would communicate statements to prospective customers and existing retailers, that falsely stated or implied, *inter alia*, (a) that Starkey fabricated a collection of falsehoods for the purpose of attempting to extort money from his former business associates at Global Prosperity, (b) that Starkey never purchased the Sixteenth Amendment Reliance Defense from any Global Prosperity vendor, (c) that no one affiliated with Global Prosperity ever told Starkey that the Reliance Defense could be used to avoid the payment of income tax or the imposition of penalties for a prior tax year, and (d) that Starkey was removed from Global Prosperity for unethical behavior after stealing money from Global Prosperity and its customers. It was further part of said scheme and artifice that these falsehoods would be posted on a website www.therealstory.tv, leased by Ms. Claudia Hirmer, a Global Prosperity Qualified Retailer and personal agent of David Struckman. On information and belief, these

statements have been posted continuously on the Real Story Website since at least February, 2002.

123.     On at least three separate occasions during October, 2002, standalone documents containing the aforementioned falsehoods were sent via electronic mail to John Doe #1 and John Doe # 2, both of Claremore, Oklahoma by PQI Consultant Don Robert, and to John Doe # 3 of Dallas, Texas by PQI Consultant Jessica Burgess. In addition, during a telephone conversation in October, 2002, Robert told John Doe # 1 and John Doe #2 that Starkey had tried to "blackmail" Global Prosperity by making up a pack of lies, and specifically referred John Doe #1 and John Doe # 2 to the Real Story Website containing these falsehoods.

124.     Based on several telephone conversations between Starkey and John Doe # 3 during October, 2002, each of which occurred prior to John Doe # 3's learning of the statements reported on the Real Story Website, Starkey had a reasonable business expectancy that John Doe # 3 would enter into a valid business contract with Starkey. During one of these conversations, John Doe # 3 indicated to Starkey that he was aware of Starkey's prison record and even commended Starkey for being upfront and open about it. Later that month, John Doe # 3 indicated to Starkey that he would not be doing business with him. On information and belief, John Doe # 3 decided not to conduct business with Starkey because of the statements he read on the Real Story Website concerning Starkey's alleged attempts to blackmail Global Prosperity.

125.     At the time each of the aforementioned falsehoods was originally posted on the Real Story Website or communicated to said John Does, each of the

defendants, and their co-conspirators Don Robert, Claudia Hirmer, and Jessica Burgess knew the statement was false, or in the alternative, entertained serious doubts as to the statement's truth.

126. Defendants' interference with Starkey's reasonable business expectancy with John Doe # 3 was intentional, malicious, and committed with no justification or excuse, solely to cause Starkey emotional distress or economic duress in order to further the unlawful goals of the conspiracy and to incite a prospective client to evade tax withholding, tax reporting, and tax collecting.

127. The statements on the Real Story Website calling Starkey a liar and accusing him of unethical behavior, are libelous per se.

128. In the alternative, assuming the statements are libelous per quod, Starkey has suffered special damages in the form of lost income and lost sales revenue.

129. As a direct and proximate result of the libelous statements communicated by defendants, their agents and co-conspirators, and as a direct and proximate result of defendants' intentional and malicious interference with Starkey's reasonable expectancy, Starkey has suffered, and continues to suffer damages, including emotional distress, mental pain, mental anguish, reputational damage, humiliation, loss of friendship, lost income, and incidental and consequential damages.

**D. <u>Count Five: Intentional Infliction of Emotional Distress (Outrage)</u>**

130. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 129 above as if fully set forth herein.

131.     Beginning approximately April, 2000, and continuing up to the present, Defendant David Struckman has personally, and through a network of agents and co-conspirators, known and unknown, engaged in a course of extreme and outrageous conduct against Starkey, including committing or causing to commit each of the following acts:

a. threatening Starkey and his family by telephone and warning Starkey to keep silent concerning the false and fraudulent claims made by Global Prosperity/PQI about its abusive tax shelters;

b. vandalizing Starkey's property by flattening his tires and leaving threatening messages on Starkey's windshield;

c. blacklisting Starkey in the eyes of Starkey's friends and associates by communicating complete falsehoods about Starkey allegedly trying to extort money from Global Prosperity;

d. posting these same blatant falsehoods on a promotional website www.therealstory.tv; and

e. circulating these same falsehoods via electronic mail to prospective clients of Starkey thereby causing Starkey to lose income and sales revenue as a result.

132.     Defendant David Struckman, his agents, and co-conspirators have committed the acts identified in paragraph 131 intentionally, recklessly, maliciously, and without just cause or excuse, for the purpose of causing Starkey such severe emotional

distress and economic duress that Starkey will remain silent about the false and fraudulent claims made by Global Prosperity/PQI and its abusive tax shelters.

133. The tortious conduct alleged in this Count and committed against Starkey is so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. By virtue of this tortious conduct, Starkey has suffered, and continues to suffer, severe emotional distress, mental pain, and mental anguish.

## E. Count Six: Breach of Fiduciary Duty

134. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 133 above as if fully set forth herein.

135. During Starkey's employment with Global Prosperity, Struckman repeatedly represented himself as an international expert on the legality and constitutionality of the Federal income tax and on the use of offshore trusts to legally stop paying taxes. On or about March, 1997, Struckman agreed to be Starkey's personal mentor regarding the design and marketing of various offshore trusts and the implementation of other strategies that Struckman represented to Starkey could be used to legally avoid the payment of Federal income tax. At the time Struckman agreed to act as Starkey's mentor, Struckman was aware of Starkey's mental infirmities, including Starkey's limited formal education, automobile-related head trauma, and associated cognitive impairments. By agreeing to serve as Starkey's personal mentor in this manner, Struckman voluntarily accepted a relationship whereby Struckman would exercise domination and control and Starkey would repose complete trust and confidence

in Struckman's judgment regarding the legality of aforementioned tax elimination strategies.

136. Struckman knew, or in the exercise of reasonable diligence, should have known, that the tax elimination strategies Struckman was advising Starkey to implement were illegal.

137. Struckman breached his fiduciary obligations of care, loyalty, and unqualified candor, by failing to advise Starkey that the aforementioned tax elimination strategies were illegal, and by committing the tortious conduct alleged in Count One (Fraud), Count Two (Fraud in Connection with a Criminal Defense), Count Three (Defamation), Count Four (Intentional Interference with Prospective Advantage), and Count Five (Outrage) above.

**F. Count Seven: Civil Conspiracy**

138. Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 137 above as if fully set forth herein.

139. At all times material to this action, defendants participated in a civil conspiracy among themselves, and with other persons, known and unknown, the purposes of which were, *inter alia:*

a. to deceive broad segments of the general public by falsely representing that the payment of Federal income tax is voluntary for most Americans, that these Americans could legally stop paying income tax through the use of offshore trusts, that a mandatory tax would exceed the limits imposed

on Congress by the United States Constitution, and that the Sixteenth Amendment to the Constitution was never properly ratified;

b. to promote the sale of financial seminars and other products making the false representations identified in subparagraph (a);

c. to promote the sale of abusive tax shelters and other illegal tax elimination strategies; and

d. to preserve and expand the market for said financial seminars, abusive tax shelters, and illegal tax elimination strategies and to maximize the joint profits of defendants and their co-conspirators from the sale of said products.

140.     From at least as early as September, 1996, and continuing until the time of the filing of this Complaint, in the Northern District of Oklahoma, and elsewhere, defendants and others known and unknown, did knowingly and intentionally, devise and intend to devise a scheme and artifice to defraud, and obtain money and property from, members of the public, and to incite said members to commit numerous illegal acts, by means of false and fraudulent pretenses, representations, assurances, and omissions of material facts, knowing that such pretenses, representations, and assurances were false when made.

141.     The conspiracy is an ongoing organization whose constituent elements function as a continuing unit in maximizing the joint profits from the sale of said illegal tax elimination products.  On information and belief, the number of co-conspirators is at least 10,000 and includes, at a minimum, owners and operators of more

than 1,000 Internet websites promoting or selling abusive tax shelters and other illegal tax elimination products. The constituent members of the conspiracy are aware that unless they agree to act in concert, the joint profits from the sale of said illegal tax elimination products would substantially decrease.

142.    It was part of said scheme and artifice that defendants and their co-conspirators would and did sell products for purchase that falsely represented *inter alia*, that there exists no statutory obligation for most Americans to file and pay Federal income tax, that their legal position had been accepted by the courts, and that purchasers of said products were tax-exempt according to the IRS.

143.    It was further part of said scheme and artifice that defendants and their co-conspirators would and did maintain sales and maximize joint profits from the sale of said products through a pattern of false representation, concealment, and suppression of material information regarding (a) the legal credentials and expertise of defendants and their co-conspirators, and (b) the success rate of said products in enabling purchasers to legally avoid payment of Federal income taxes.

144.    It was further part of said scheme and artifice that defendants and their co-conspirators would and did misrepresent, conceal, and hide, and cause to be misrepresented, concealed, and hidden, the purpose of, and acts done in furtherance of, the scheme to defraud.

145.    It was further part of said scheme and artifice, and in furtherance thereof, that defendants would communicate with each other and with their co-conspirators and others, in person, by public mail or private courier, by electronic mail,

and by telephone, regarding ways to suppress correct information regarding Federal income tax laws, the legal credentials and expertise or lack thereof of defendants, and the true success rate of defendants' products and programs, and to impair, impede, and defeat, individuals attempting to communicate said correct information.

146. Defendants and their numerous co-conspirators, known and unknown, furthered the goals of the conspiracy in numerous ways, including *inter alia,*

a. utilization of the Internet or world wide web as a principal channel of communication among defendants and their co-conspirators to ensure that the conspirators continue to espouse the party line and to react to new government threats to the market for abusive tax shelters and illegal tax elimination products;

b. making frequent references to the nearly identical claims espoused by co-conspirators on their numerous Internet websites for the purpose of lending credibility to defendants' frivolous arguments and thereby maximizing the joint profits of defendants and their co-conspirators from the sale of said illegal products; and

c. utilization of the Internet or world wide web to provide a uniform voice to propagate defendants' false and misleading material statements regarding the alleged tax benefits from participating in programs sold by defendants and their co-conspirators, to ensure that defendants and their co-conspirators remained at least one step ahead of government authorities

seeking to communicate correct information, and to ensure that defendants and their co-conspirators continued to act in concert.

147.     Defendants and their co-conspirators committed hundreds, and perhaps thousands, of acts involving material fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure over at least the last six years.  Defendants' and their co-conspirators' acts of misrepresentation and concealment have taken a number of forms, many of which are unknown to Plaintiff because such actions and concealment are within the exclusive knowledge of defendants.  Plaintiff is unable to allege in full the numerous Internet advertisements, promotional teleconference calls, and other communications that defendants and their co-conspirators have released because Plaintiff does not have access to this information.  Indeed, it is the defendants themselves who are in the best position to know the contents of each and every such misrepresentation and fraudulent statement.

148.     Hundreds of telephone conversations, Internet communications, and communications made via commercial digital recordings, have been made to further the fraudulent scheme on virtually a daily basis, including without limitation those communications identified in Sections IV B, D, E, and F above concerning defendants' misrepresentations of law, misrepresentations of the legal credentials of defendants and their agents, and misrepresentations of the alleged success of Global Prosperity and PQI products and services.  In addition, defendants have committed numerous acts intended to conceal the correct statements of law and the unbroken pattern of failure of defendants'

tax eliminations programs, including without limitation those acts identified in Section IV G above.

149.     Each act of the conspiracy was ratified by the other defendants, who acted as each other's agents in carrying out the conspiracy.

150.     As a direct and proximate result of the concerted acts of the defendants, Plaintiff Starkey has suffered, and continues to suffer, severe emotional distress, mental pain, mental anguish, reputational damage, humiliation, loss of friendship, lost income, and incidental and consequential damages.

151.     Each defendant continues to promote and market products for sale to the general public that falsely represent that the Federal income tax is illegal or unconstitutional and that purchasers of said products may legally stop paying income taxes by using defendants' methods or programs.   The conspiracy is an ongoing organization functioning as a continuing unit to further the aforementioned conspiratorial goals of maximizing joint profits from the sale of said products or programs.

152.     Each defendant is jointly and severally liable for the tortious and wrongful conduct of the other members of the conspiracy which was committed in furtherance of the goals of the conspiracy, including, but not limited to, conduct alleged in Count One (Fraud), Count Two (Fraud in Connection with a Criminal Defense), Count Three (Defamation), Count Four (Intentional Interference with Prospective Advantage), Count Five (Outrage), and Count Six (Breach of Fiduciary Duty) above.

**G.     Count Eight: Piercing the Veil (Disregard of Corporate Entity)**

153.    Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 152 above as if fully set forth herein.

154.    Defendant David Struckman, on or about July 1, 2002, organized or caused to be organized Defendant Pinnacle Quest International, Inc., an International Business Corporation purportedly incorporated under the laws of Panama, for the avowed purpose of facilitating the sale of financial seminars and other products promoting various tax elimination and asset protection strategies. Defendant Struckman has held the office of marketing manager from the date of incorporation to the present time.

155.    Defendant Struckman, as founder and alter ego of Pinnacle Quest International, Inc., is, and has been conducting, managing, and controlling the affairs of Pinnacle Quest International, Inc. since its incorporation, as though it were Defendant Struckman's own business, and has used Pinnacle Quest International, Inc. to defeat public convenience, to defraud the general public by marketing abusive tax shelters and other illegal tax elimination strategies, and to incite Pinnacle Quest International's clients to evade tax withholding tax reporting, and tax collecting.

156.    Defendant Synergy Productions, International, Inc., a Missouri-based corporation, was organized for the avowed and exclusive purpose of registering, supervising, and monitoring Consultants of Pinnacle Quest International, Inc. Synergy Productions International, Inc., as instrumentality of Pinnacle Quest International, Inc., conducts all its business affairs for the purpose of benefiting Pinnacle Quest

International, Inc., its consultants, agents, and co-conspirators, and of facilitating the sale of Pinnacle Quest International's abusive tax shelters, financial seminars, and other illegal products.

157.    Defendant David Struckman, as founder and alter ego of Pinnacle Quest International, Inc. is liable for all tortious conduct committed by Pinnacle Quest International, its consultants, agents, and co-conspirators, and all torts committed by instrumentality Synergy Products International, Inc., its consultants, agents, and co-conspirators, including the tortious conduct alleged in Count Three (Defamation), Count Four (Intentional Interference with Prospective Advantage), Count Five (Outrage), and Count Seven (Civil Conspiracy) above.

**H.    Count Nine: Violation of the Provisions of the Securities Act of 1933**

158.    Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 157 above as if fully set forth herein.

159.    At all times material to this action, Global Prosperity operated, and PQI continues to operate, a multilevel marketing program or pyramid scheme whereby a person invests money in a common enterprise and is led to expect profits solely from the efforts of a promoter or third party.   The initial investment made by a prospective investor is the purchase of a program.   The program is any series of financial tapes or seminars.   To become a Qualified Retailer in Global Prosperity, or a Qualified Consultant in PQI, the investor is required to meet a one-time qualification of four referral sales. Once the investor has referred a total of four sales (purchases of a program), he becomes a Qualified Retailer or Qualified Consultant and is then allowed to make an eighty

percent (80%) profit on the sales of programs to other prospective investors. Prior to completing these referral sales, the investor makes no profit on any sale of Global Prosperity or PQI programs.

160. Investments in Global Prosperity or PQI programs are investments in securities as defined in the Securities Act of 1933, specifically Section 2(1) of the Act, 15 U.S.C. § 77b(1). *See, also, Exhibit 3, Final Order of The Commonwealth of Massachusetts, Office of the Secretary of the Commonwealth, Securities Division*, (entering default judgment on Administrative complaint alleging that Global Prosperity programs are investment contracts or securities under Massachusetts General Laws and ordering Global Prosperity to cease and desist selling such programs). On information and belief, Defendants Struckman, LaMantia, and Andersen were aware of, but completely ignored the Massachusetts Cease-and-Desist Order and established PQI and Stratia Corporation in part because of the negative publicity surrounding this Cease-and-Desist Order.

161. At no time have Global Prosperity or PQI programs been classified as exempt securities under the Act, nor have their sales been classified as exempt under the Act.

162. At no time during the sale of Global Prosperity or PQI programs, or during negotiation for the sales, did any of the defendants, or any other person on defendants' behalf procure an express or implied authorization from the Securities and Exchange Commission to sell the above-described securities.

163.     At no time did any of the defendants, or anyone on defendants' behalf comply with the requirements of the Securities Act of 1933, or the regulations promulgated under the Act with respect to the sale or offering for sale of the above-described securities, by filing in the office of the Securities and Exchange Commission any statements or documents required by the Act.

164.     At all times material to this action, each of the Defendants Struckman, LaMantia, Andersen, and PQI has maintained or participated, directly or indirectly in an interactive website whereby the Defendant actively solicits the purchase of, and enters into contracts executing the sale of, the above-described securities.  At all times material to this action, each Defendant has carried or caused to be carried through the mails or in interstate commerce, the above-described securities for the purpose of sale or for delivery after sale, in direct violation of Section 5(a) of the Act, 15 U.S.C. § 77e(a).

165.     Defendants Struckman, PQI, and SPI have committed multiple securities violations, have not acknowledged the wrongful nature of their conduct, can provide no assurances against future violations, and have an incentive to commit such violations in the future.   In light of Defendant Struckman's, Defendant PQI's and Defendant SPI's repeated flouting of the securities laws and failure to file appropriate registration statements with the Securities and Exchange Commission, there exists a reasonable likelihood of ongoing future violations of the securities laws.

166.     Each of the instances of tortious and unlawful conduct committed against Starkey and alleged in Counts One through Eight above, was committed directly or indirectly, for the purpose of preserving and expanding the market for the above-

described securities. As a direct and proximate result of defendants' wrongful conduct, Starkey has suffered, and continues to suffer, ongoing damages including emotional distress, humiliation, reputational damage, loss of friendship, lost income, and incidental and consequential damages. Unless this Court enjoins Defendant Struckman and Defendant PQI from selling PQI programs in the future, Starkey is likely to suffer irreparable injury.

**I.    Count Ten: Conspiracy to Violate the Provisions of the Securities Act of 1933**

167.    Plaintiff realleges and incorporates by reference in this Count the allegations contained in paragraphs 1 through 166 above as if fully set forth herein.

168.    At all times material to this action, defendants participated in a civil conspiracy among themselves, and with other persons, known and unknown, the purpose of which was to maximize the joint profits from the sale of abusive tax shelters and other illegal tax elimination products by utilizing a pyramid scheme as a pivotal means of maximizing the profits of said illegal products.

169.    Hundreds of telephone conversations, Internet communications, and communications made via commercial digital recordings, have been made to further the illegal scheme on virtually a daily basis, including without limitation those communications identified in Sections IV B, D, E, and F above.

170.    Each of the instances of tortious and unlawful conduct committed against Starkey and alleged in Counts One through Eight above, was committed directly or indirectly, for the purpose of preserving and expanding the market for the above-described securities. *See, supra, Section V H.* As a direct and proximate result of

defendants' wrongful conduct, Starkey has suffered, and continues to suffer, ongoing damages including emotional distress, humiliation, reputational damage, loss of friendship, lost income, and incidental and consequential damages.

171. Said civil conspiracy has lasted to this day and is continuing. Unless this Court enjoins Defendant Struckman and Defendant PQI from selling PQI programs in the future, Starkey is likely to suffer irreparable injury.

## J. Equitable Relief Together with a Large Punitive Damage Award are Both Necessary to Prevent and Restrain Defendants' Wrongful Conduct in the Future

172. Defendants' affirmative and intentional acts of fraudulent misrepresentations and denial of the facts as alleged above has continued unabated over a span of several years and unless restrained by this Court, is likely to continue into the future. Defendants have maintained a unified scheme to defraud a broad segment of the general public into believing that these people can legally avoid payment of Federal income taxes and to incite these people to imminent lawlessness. In furtherance of their unlawful scheme, they have repeatedly suppressed and subverted the true facts regarding Starkey's exposé of their illegal methods, have debased and denigrated Starkey's character, and have subjected him to repeated physical threats – all through an uninterrupted pattern of fraudulent and deceitful conduct aimed at maintaining a market for abusive tax shelters and other illegal products and of increasing their own profits at the expense of the general public.

173.     When an organized conspiracy of well-funded scam artists, armed with the most sophisticated marketing methods and cyber age technology, can falsely represent that they themselves are attorneys, falsely represent that they are in litigation with individuals and websites reporting the true facts, and falsely represent that their absurd legal interpretations have been accepted by the courts, all with apparent impunity, it is time to recognize that traditional legal remedies cannot possibly succeed. The ever-increasing problem of tax protester cyberscams has become a massive and highly profitable conspiracy spinning completely out of control. With more than 1,000 websites devoted to illegal constitutional trusts alone, the tax protester scam movement has been feeding on itself for years, with new scam artists cropping up daily, each pointing to one another's websites and citing the government's apparent willingness to allow these sites to operate as vindication that the claims of the scam artists must be right.

174.     In the absence of substantial civil damage awards paid to bona fide victims of these Internet scams, the problem may soon become intractable. The problem has become greatly exacerbated in recent years, in part because the scam artists can secrete assets in foreign trusts and establish residence in countries such as Panama and Costa Rica where they can bribe their way out of extradition. The need for substantial civil damage awards to stem the rising tide of tax protester Internet scams is therefore undeniable.

175.     David Starkey was a victim of one of the most slickly marketed tax protest scams in history. A man with limited formal education, Starkey cannot read more than two pages at a time. Starkey looked to Global Prosperity, not as a means of

protesting the tax laws, but of working his way out of poverty. Starkey fell victim to a group of conmen who deliberately prey on the poor and unemployed, duping them into believing they can live the great American dream, but only if they first believe that the products they are selling are real. A simple and relatively trusting man, Starkey saw no reason to question the legal interpretations of the defendants regarding the tax laws, interpretations which defendants represented to Starkey were endorsed by an elite group of Global Prosperity contributors, including a supposed Federal judge and a sitting United States Congressman. The atrocities visited upon Starkey, confinement in Federal prison, defamation and denigration of his character, and threats against Starkey and his family, should not be suffered by anyone in our society.

**K. Oklahoma Law Requires that Starkey Recover a Large Punitive Damage Award**

176. Oklahoma law allows recovery of punitive damages against defendants who commit intentional and malicious actions toward others based on the following factors: (a) the seriousness of the hazard to the public arising from defendant's conduct, (b) the profitability of the misconduct to the defendant, (c) the duration of the misconduct and the concealment of it, (d) the degree of defendant's awareness of the hazard and of its excessiveness, (e) the attitude and conduct of the defendant upon discovery of the misconduct or hazard, (f) the number and level of employees involved in causing or concealing the misconduct, and (g) the financial condition of the defendant, 23 Okl. St. § 9.1.

177.     Each of these factors argues for an extremely large punitive damage award. Defendants are engaged in a massive and highly lucrative conspiracy to defraud the general public and incite its members to imminent lawlessness.    On information and belief, each of the defendant's has substantial assets located in the United States. The defendants' ongoing pattern of concerted and reprehensible actions, trickery and deception, and concealment of the true facts when their wrongful actions were discovered, a pattern spanning over a period of years, is completely without any redeeming social value whatsoever. Nothing short of complete disgorgement of any and all ill-gotten gains can possibly succeed in restraining defendants' unlawful conduct and in deterring others from committing similar conduct in the future.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the plaintiff, DAVID WAYNE STARKEY, prays for relief and judgment against all defendants, jointly and severally, as follows:

### A.    Remedies at Law:

Awarding damages to David Starkey, pursuant to Counts One through Eight, for defendants' tortious and wrongful acts, as alleged above, as follows:

1.    Awarding David Starkey compensatory damages for emotional distress, mental pain, mental anguish, reputational damage, humiliation, loss of friendship, lost income, and incidental and consequential damages, in an amount not less than $3,000,000 (THREE MILLION DOLLARS).

2.    Awarding David Starkey punitive damages for defendants' intentional, malicious, and spiteful actions, which have caused Starkey great harm and which present a continuing threat to the general public, in an amount not less than $9,000,000 (NINE MILLION DOLLARS).

3.    Awarding David Starkey the costs of this suit, together with such other and further relief as may be necessary and appropriate.

### B.    Declaratory Relief:

1.    Pursuant to the provisions of 28 U.S.C. § 2201 and Fed. R. Civ. P. 55, that this Court declare that sales of PQI programs constitute investments in securities, as

defined in the Securities Act of 1933, specifically Section 2(1) of the Act, 15 U.S.C. § 77b(1).

2. Pursuant to the provisions of 28 U.S.C. § 2201 and Fed. R. Civ. P. 55, that this Court declare that the statements reported on Starkey's website, www.igpfraud.com are true and accurate, that Starkey resigned his employment from Global Prosperity and was not in any way dismissed from Global Prosperity for wrongful conduct, and that Starkey did not attempt to extort money from Global Prosperity, all as falsely reported on the Real Story Website.

C. **Equitable Relief:**

1. Pursuant to Fed. R. Civ. P. 65(d), that this Court enter a permanent injunction prohibiting Defendant Struckman and Defendant PQI, and each of its representatives, agents, servants, employees, attorneys, and all persons acting in concert with each defendant, from selling PQI programs or entering into any other contracts, transactions, or schemes, which constitute sales of non-exempt securities as defined in the Securities Act of 1933, without first complying with the requirements of the Act and the regulations promulgated there under.

2. Pursuant to Fed. R. Civ. P. 65(d), that this Court enter a permanent injunction prohibiting each defendant and its representatives, agents, servants, employees, attorneys, and all persons acting in concert with each defendant, by means of false, deceptive, or misleading commercial speech, from communicating in writing that the statements reported on Starkey's website www.igpfraud.com are false, that Starkey

did not resign his employment from Global Prosperity, or that Starkey attempted to extort money from Global Prosperity.

3.     Pursuant to Fed. R. Civ. P. 65(d), that this Court enter an injunction requiring David Struckman, as marketing manager of Pinnacle Quest International, Inc., to send a letter to all persons to whom David Struckman or any other Pinnacle Quest International Consultant, gave, sold, or distributed, any Pinnacle Quest International financial seminar or other commercial product, informing those persons of the entry of the Court's findings concerning the falsity of the statements concerning David Starkey and the fact that a permanent injunction has been issued against the defendants, attaching a copy of the permanent injunction to the letter.

4.     That this Court grant David Starkey such other and further relief as the Court deems necessary and appropriate.

## VII. DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial on all issues so triable under this action.

Dated: December 17, 2002

Respectfully submitted,

Thomas E. Kimble
Illinois Bar # 6257935
424 Westview Terrace
Arlington, TX 76013
Ph: 817-223-1654
E-mail:
thomas_kimble@hotmail.com

Ja. D. Adkisson, OBA# 13095
4041 MacArthur Blvd., Suite 170
Newport Beach, CA 92660
Ph: 949-756-8444
Fax: 949-756-8666
E-mail: jay@falc.com

Attorneys for Plaintiff



MAR 20 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

CV 02-642 #1

# United States District Court

## For the western district of Washington

| | |
|---|---|
| **Kenneth Wayne in his official capacity as Attorney-in Fact** for the interests of David Struckman<br>**Plaintiff,**<br>**vs.**<br>**Ricardo S. Martinez;**<br>**Defendant,** | **Cause No.** C02-642C<br>**Complaint for DECLARATORY JUDGMENT And other relief as may be provided by law**<br>**TRIAL BY JURY DEMANDED HEREIN** |

**Comes now the Plaintiff,** Kenneth Wayne in his official capacity as Attorney-in Fact for David Struckman, to petition the court for redress of grievance in the nature of Declaratory Judgment, and other relief as may be appropriate as an operation of law upon declaration by the court of the facts and rights and duties of the parties as set forth more fully herein:

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

EXHIBIT 1

## DEFINITIONS

The term "federal area" includes the District of Columbia, the territories and insular possessions of the United States, the Philippines so far as federal statutes appear to make them subject to the jurisdiction of the United States, and areas within any of the several states ceded by the legislature thereof and accepted by Congress as a fort, magazine, dockyard, or other needful building over which Congress has been constitutionally delegated powers to enact legislation.

The term "USDC-WW" means the United States District Court for the western district of Washington.

The term "FRCP" means the Federal Rules of Civil Procedure.

The term "Bill of Rights" includes the first ten Articles in Amendment to the federal constitution.

## VERIFICATION 1

Pierce county )<br>
) Verified Declaration<br>
The state of Washington )

Declarant states that he is competent to be a witness and that the facts presented herein are true and correct to the best of Declarant's first hand knowledge and belief under penalty of perjury pursuant to the law of the state of Washington.

David Struckman — March 14, 2002<br>
David Struckman — Date<br>
Declarant

C/o American-International Business Law, Inc<br>
17719 Pacific Ave S #308<br>
Spanaway, Washington 98387<br>
Phone/Fax 888-870-0869

## VERIFICATION 2

Pierce county )
) Verified Declaration
The state of Washington )

Declarant states that he is competent to be a witness and that the facts presented herein are true and correct to the best of Declarant's first hand knowledge and belief under penalty of perjury pursuant to the law of the state of Washington.

Kenneth Wayne
Declarant

3/15/2002
Date

## JURISDICTION

1. The court has subject matter jurisdiction of the federal questions raised as granted by Congress by the act(s) codified at 28 USC 1343 pursuant to Article III of the federal constitution.

2. The court has venue jurisdiction as the acts (or some of the acts) upon which federal questions are raised occurred within the western district of Washington, at King county, Washington, as codified at 28 USC 28 USC 128(b), 28 USC 132; 28 USC 1391.

## PARTIES

3. The Plaintiff is a person having express contractual duties to prosecute the interests of the real party in interest, David

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

Struckman who is not joined as a named party, and as such is/are person(s) guaranteed due process of law and equal protection of the law as one of the sovereign people of the state of Washington as guaranteed at Article XIV in Amendment to the federal constitution, the authority of the Attorney-in Fact as an operation of a contract protected by Article 1, Section 10 (clause 1) of the federal constitution, to bring the complaint on behalf of the real party in interest without joining the real party in interest is recognized at FRCP 17(a).

4. Defendant Ricardo S. Martinez (herein "Defendant Martinez") holds, or purports to hold, the office of United States Magistrate Judge, an office subject to the requirement for any person holding such office to execute an Oath of Office contract before entering upon the duties of the office held, under the authority of the United States and has an extraordinary duty to prevent or correct illegal or unlawful acts in actions subject to his jurisdiction. Defendant Martinez is sued in his individual capacity as a party to the Oath of Office contract to which the real party in interest is a beneficially interested party, said Oath of Office contract incorporating by reference the federal constitution and laws, and is alleged herein to have acted in breach of the Oath of Office contract.

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-370-0869

## REMEDIES REQUESTED

5. Plaintiff requests DECLARATORY JUDGMENT as it pertains to Plaintiff(s) and such other persons as the context requires, that:

a. Defendant Martinez has superior knowledge of the law; have an extraordinary duty to know the law; and has an express duty by Oath of Office contract executed before entering upon the duties of the office of United States Magistrate Judge to assure that the law is faithfully complied with.

b. The records of USDC-WW, cause # 01-114m does not provide any evidence or allegation that the place sought to be searched, and subsequently searched and from which property was seized, is within any federal area;

c. USDC-WW does not have venue jurisdiction to issue a warrant for the place sought to be searched.

d. Absent venue jurisdiction of the USDC-WW of the place to be searched, issuance of process for search and seizure is outside the scope of the jurisdiction and duties of federal judicial officers of the court, and an act of the person under color of law outside the scope of any official duties.

e. The record of USDC-WW, cause # 01-114m does not provide any evidence or allegation of any constitutional or

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

statutorily identifiable taxable activity by any person named in the application for search warrant, or alleged to be associated with any person named in the application for search warrant, upon which a tax obligation invoking the jurisdiction of the Commissioner of Internal Revenue, or other federal tax authority, could lie;

f. There being no evidence or allegation of any federal taxable activity as the source of funds received by any person named in the application for a search warrant, or any person associated with any person named in the application for search warrant, the application process fails to invoke the subject matter jurisdiction of the USDC-WW.

g. There being no federal taxable activity as the source of funds received by any person named in the application for a search warrant application, or any person associated with any person named in the search warrant application, the application process fails to invoke the subject matter jurisdiction of the USDC-WW.

h. Absent subject matter jurisdiction of the USDC-WW there is no authority for any judicial officer thereof to issue process including but not limited to a search warrant.

i. For lack of subject matter jurisdiction of the USDC-WW, the

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

unreasonable search and seizure;

b. Defendant Martinez, purporting to act as a United states Magistrate Judge;

c. On or about February 23, 2001, within the western district of Washington at the United States District Court at Seattle;

d. Did knowingly, intentionally, or with gross negligence, execute a document styled a "Search Warrant" without there appearing as a matter of record any evidence of any federally taxable activity within any federal area as a source of funds upon which a federal internal revenue or federal income tax obligation could lie, and thus without any actual evidence upon which a claim of a federal criminal tax violation could lie;

e. Without any evidence that the place sought to be searched was within any federal area;

f. Without any evidence upon which lawful authority for a search and seizure could lie;

g. Resulting directly or proximately in the unconstitutional search of private property, and seizure of private property lawfully held by Plaintiff;

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

evidentiary finding of cause to believe a crime had been committed or is/was in progress.

9. The "Warrant" expressly describes the location to be searched as located at "630 NW Datewood Drive, Issaquah, Washington".

10. The "Warrant" does not provide any indication of any evidence that the place to be searched is within a federal area.

11. The "Warrant" specifically describes each place to be searched as located at "Issaquah, Washington", appearing to be a location within one of the member states of the union of the United States of America.

12. The record shows, and Declarant(s) have knowledge that, on or about February 23, 2001, a person identified as "Jeff Holm", and other persons entered a private home located at 630 NW Datewood Drive, Issaquah, Washington.

## CLAIMS

13. Plaintiff states and claims that:

a. Contrary to the due process and equal protection clauses of Article XIV in Amendment to the federal constitution, guaranteeing the due process and the right s guaranteed by the Bill of Rights to be free from

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

are presented to the record of the court.

n. Defendant Martinez refused or willfully neglected to perform his extraordinary express duty to refuse to execute an unfounded warrant in breach of the Oath of Office contract required to be executed before entering and executing the duties of the office of United States Magistrate Judge.

o. There was no evidence or allegation of a taxable activity within a taxable venue presented to the record upon which Defendant Martinez could have found cause to believe a crime had been, or was being, committed.

6.    RESERVED: Plaintiff reserves the right to amend this request for remedies to request any other remedy allowed by law upon a declaration of the rights and duties of the parties as provided at 28 USC 2201.

## FACTS

7.    The record of the USDC-WW, Cause #01-114m, shows that on or about February 23, 2001, on papers bearing the marks of the United States Attorney #200R01456, a Jeff Holm made application for a search warrant, the application process assigned USDC-WW cause #01-114m.

8.    The "Warrant" does not contain, or have attached, any affidavit upon which the court could have made any

issuance of process of the USDC-WW under cause #01-114m is not within the scope of its judicial office, and is an act of the individual under color of law outside the scope of any official duty.

j. For lack of venue jurisdiction there is no search warrant issued upon which any person could lawfully search, or seize property from, the place described in the USDC-WW #01-114m application.

k. There being no search warrant, the search and seizure conducted at the place described in the application process for USDC-WW #01-114m is an unconstitutional search and seizure.

l. There being no search warrant the property seized under color of process for USDC-WW #01-114m is unlawfully and unconstitutionally seized under color of law.

m. Defendant Martinez, as an operation of his Oath of Office contract incorporating by reference the constitution and laws of the United States, executed before entering upon the duties of United States Magistrate Judge, has an extraordinary duty to NOT issue any document styled a search warrant unless sufficient foundational elements to believe that the alleged crime could have been committed

h. Plaintiff states and claims that Plaintiff continues to be unconstitutionally deprived of his property.

14. Plaintiff states and claims that:

a. Contrary to the rights guaranteed by the equal protection and due process clauses of Article XIV in Amendment to the federal constitution and the right to be free from unreasonable search and seizure guaranteed by the Bill of Rights;

b. Defendant Martinez, in breach of his Oath of Office contract;

c. On or about February 23, 2001;

d. Within the western district of Washington at the United States District Court at Seattle;

e. Knowingly, intentionally and willfully or with gross neglect, failed to prevent the issuance of a document styled a "Search Warrant" under color of United States law when the record failed to support a finding of any evidence presented to the record of any federally taxable activity, evidence of any taxable activity within a federal area, evidence of any funds from a federally taxable activity or area upon which a finding of probable cause to investigate a federal tax crime could

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

lie; and without any evidence that the place sought to be searched was within any federal area;

f. Without any evidence upon which lawful federal authority could lie;

15.   Plaintiff states and claims that:

a. The unconstitutional acts, and their consequences;

b. Occuring beginning February 23, 2001 and continuing through the present day;

c. Committed by Defendant Martinez;

d. Are absent constitutional authority;

e. Are not within the official duties of United States Magistrate Judge;

f. And absent lawful authority, and in breach of the Oath of Office contract executed by Defendant Martinez are necessarily the acts of Defendant Martinez as a private individual acting under color of law.

16.   Plaintiff states and claims that:

a. Plaintiff has a reasonable expectation that persons who have accepted the duties of a public office, and specifically the office of United States Magistrate

CRTF \  \Declaratory Judgment
Complaint 1 doc

Page 12 of 14

C/o American-International Business Law, Inc
17719 Pacific Ave  S  #308
Spanaway, Washington 98387
Phone/Fax  888-870-0869

Judge, will faithfully perform the duties of the office accepted as incorporated in the officer's Oath of Office contract;

b. A failure to perform a duty is not an official act within the scope of office;

c. A governing body may not intervene and indemnify, and provide official immunity for an act expressly prohibited by the organizing instrument, such as its constitution;

d. A governing body may not intervene and indemnify, and provide official immunity for an omission of an express duty under an Oath of Office contract incorporating the body's constitution where the claimant is a beneficially interested party to the Oath of Office contract.

e. An Oath of Office contract is a private act required BEFORE entering upon the duties of federal office, and specifically the office of United States Magistrate Judge;

f. Breach of the Oath of Office contract by Defendant Martinez is a private act as an individual party to the Oath of Office contract, and outside the scope of the

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

office of United States Magistrate Judge.

**WHEREFORE:**

17. Plaintiff requests the remedies and relief requested hereinabove; and,

18. Plaintiffs request the right to amend the complaint to seek such other remedies and/or relief as may be required or authorized by law.

19. TRIAL BY JURY DEMANDED ON EACH AND EVERY ISSUE RAISED HEREIN.

Respectfully presented this 13 day of March, 2002.

**Kenneth Wayne in his official capacity** as Attorney-in-Fact for David Struckman

C/o American-International Business Law, Inc
17719 Pacific Ave S #308
Spanaway, Washington 98387
Phone/Fax 888-870-0869

FILED 7/15 ENTERED
LODGED RECEIVED
JUL 1 2002

CV 02 00642 #00000013

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH WAYNE,

Plaintiff,

v.

HONORABLE RICARDO MARTINEZ,

Defendant.

CASE NO. C02-0642C

ORDER

This matter comes before the Court on the Court's order to show cause (Dkt. No. 2) and plaintiff's response to that order (Dkt. No. 4). Plaintiff Kenneth Wayne is proceeding *pro se* in the above-captioned matter. Mr. Wayne is well-known in this district for having brought twelve cases, fou of which are currently pending. Similarly, his "Civil Rights Task Force" associate David Carroll, Stephenson, has brought twenty-five cases, three of which are currently pending. Their actions are list in Appendix A to this Order. For the following reasons, the Court hereby DISMISSES this action because it is frivolous.

This Court ordered plaintiff to show cause why this action should not be dismissed under Fed. Civ. Pro. 12(b)(6) for failure to state a claim upon which relief can be granted, or on grounds of

13

Magistrate Judge Martinez's judicial immunity.[1] Although plaintiff correctly notes in his response tha judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in his judicial capacity,[2] plaintiff does not put forth a claim upon which relief can be granted. Moreover, plaintiff's action is frivolous. Mr. Wayne and Mr. Stephenson's filings and litigation tactics appear driven by anti-legal establishment or "constitutionalist" beliefs.[3] Every one of their previous filings w frivolous, and plaintiff has not demonstrated how this action is any different.

Frivolous actions are subject to dismissal *sua sponte* by the Court. See Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988) (dismissed for frivolity); Fitzergerald v. First E. Sevent St. Tenants Corp., 221 F.3d 362, 364 (2d Cir. 2000) (same); see also Wong v. Bell, 642 F.2d 359, 361-62 (9th Cir. 1981) (Rule 12(b)(6) dismissal). All of Mr. Wayne's and Mr. Stephenson's terminated actions, thirty (30) to date, have ultimately been determined to be frivolous. In those actions, Mr. Wayne and Mr. Stephenson have, among other things, attempted to recover on state-law liens improperly placed on the property of public officials; to remove criminal prosecutions and civil actions to federal court where there were no legal bases for so doing; and to represent private parties or corporations although they are not attorneys.

An example of plaintiff's frivolous filings can be gleaned from Wayne v. Burgess, C02-5200L, case that was recently dismissed by Judge Robert Lasnik. Plaintiff sought declaratory relief in this cas against two federal judges, District Judge Franklin D. Burgess and Ninth Circuit Judge Betty Fletcher. Plaintiff initiated this action in response to Judge Burgess' dismissal of a lawsuit where plaintiff attempted to represent two individuals. Judge Burgess' dismissal order noted that plaintiff was not an

---

[1] Defendant Magistrate Judge Martinez has moved for a time extension to answer plaintiff's complaint (Dkt. No. 12). Because the Court dismisses this action entirely, that motion is moot.

[2] Pulliam v. Allen, 466 U.S. 522 (1984).

[3] Mr. Wayne's first filings in this district were attempts to recover on liens placed on the property of state officials. See, e.g., Case No. C99-904L.

attorney and could not appear in federal court to represent the individuals. See Case No. C02-5146FD. Plaintiff argued that Judge Burgess' determination was incorrect, and that jurisdiction over this action was proper under the Declaratory Judgment Act. However, that jurisdictional allegation was frivolous, as was plaintiff's Bivens claim against the federal defendants and his § 1983 claim against the state defendants. See Case No. C02-5200L (Dkt. No. 10).

Here, plaintiff primarily argues that Magistrate Judge Martinez lacks the requisite authority to authorize the search warrant at issue. Plaintiff proffers no persuasive legal authority in support of this contention in either his complaint or his response to this Court's order to show cause. Plaintiff has concocted a novel "oath contract" argument in which he contends he is a third-party beneficiary of the oath taken by Magistrate Judge Martinez to uphold the law. Plaintiff further argues that he has a cause of action because Magistrate Judge Martinez broke the law by issuing the search warrant at issue. This argument is meritless. Taken together, the facts listed in plaintiff's pleadings reveal this action is frivolous, irrespective of plaintiff's history of groundless filings in this district. Therefore, the Court DISMISSES plaintiff's action on the grounds of frivolity.

SO ORDERED this 2 day of July, 2002.

CHIEF UNITED STATES DISTRICT JUDGE

# APPENDIX A

APPENDIX OF WAYNE AND STEPHENSON CASES

I.  Kenneth Wayne: 12 Total Cases

    A.  Four Pending Cases

        1.  Wayne v. Armijo, C02-5212RJB (Pending) (Paid non-habeas action).
        2.  Wayne v. Martinez, C02-0642C (Pending) (Paid non-habeas action).
        3.  Stephenson & Wayne v. Rossotti, C02-5076Breyer (Pending).
        4.  Wayne v. Alexander, C01-5565Singleton (Pending) (Paid non-habeas action).

    B.  Eight Termed Cases

        1.  Wayne v. Burgess, C02-5200L (Termed 6/21/02) (Paid non-habeas action, dismissed as frivolous).
        2.  Wayne v. Johnson, C02-5146FDB (Termed 4/15/02) (Paid non-habeas action), dismissed).
        3.  Wayne v. Washington, C00-5655FDB (Termed 2/27/01) (Paid petition for removal of Pierce County criminal case and Snohomish County case & § 1983 action against various defendants. Removal petition remanded/ dismissed & § 1983 action dismissed for lack of jurisdiction).
        4.  Wayne v. Washington, C00-5579RJB (Termed 10/11/00) (Paid petition for removal of Pierce County criminal case, remanded/dismissed).
        5.  Wayne v. Locke, C00-05279FDB (Termed 6/14/00) (Paid habeas action, dismissed due to deficiencies).
        6.  Wayne v. Washington, C00-5273FDB (Termed 6/21/00) (Paid non-habeas action, dismissed due to deficiencies in Complaint).
        7.  Wayne v. Washington, C99-1218P (Termed 11/1/99) (Paid action for recovery on liens, referred to RSM and dismissed based upon his R&R).
        8.  Wayne v. U.S.A., C99-0904L (Termed 8/31/99) (Paid petition for removal of Snohomish County case, referred to RSM and dismissed based upon his R&R).

II.  David Carroll Stephenson: 25 Total Cases

    A.  Three Pending Cases

        1.  Stephenson v. Lehman, C02-5181Breyer (Pending) (Paid habeas action).
        2.  Stephenson & Wayne v. Rossitti, C02-5076Breyer: (Pending) (Paid non-habeas action).
        3.  Stephenson v. Bryan, C02-5036Breyer (Pending) (Paid non-habeas action).

    B.  22 Termed Cases

1. Stephenson v. Lehman, C02-5151L (Termed 6/21/02) (Paid non-habeas action, dismissed for frivolousness).
2. Stephenson v. Lehman, C01-5575RJB (Termed 12/14/01) (Paid habeas action, referred to JKA and dismissed for lack of exhaustion based upon R&R).
3. Stephenson v. Lehman, C01-5227RJB (Termed 7/27/01) (Paid habeas action, referred to JKA and dismissed for lack of exhaustion based upon R&R).
4. Stephenson v. Kitsap County & Washington, C00-5670RJB (Termed 11/16/00) (Habeas action with IFP application. IFP denied, case dismissed).
5. Stephenson v. Washington, C00-5634RJB (Termed 11/08/00) (Paid petition for removal of Kitsap and Thurston County criminal cases, remanded/dismissed).
6. Stephenson v. Washington & Kitsap County, C00-5601RJB (Termed 10/19/00) (Paid habeas petition, dismissed for lack of exhaustion and abuse of the writ).
7. Stephenson v. Washington, C00-5595RJB (Termed 10/16/00) (Paid petition for removal of Kitsap County criminal case, remanded/dismissed).
8. Stephenson v. Washington, C00-5592FDB (Termed 10/12/00) (Paid petition for removal of Kitsap county criminal case, remanded/dismissed).
9. Rejos, Inc. & Essence Unlimited v. Wash. State Employment Sec. Div., C00-5580RJB (Termed 10/11/00) (Paid petition by Stephenson for removal of civil action from Lewis County on behalf of two corporations, remanded/dismissed).
10. Stephenson v. Washington, C00-5553RJB (Termed 10/04/00) (Paid petition for removal of Kitsap County criminal case, remanded/dismissed).
11. Stephenson v. Washington, C00-5548FDB (Termed 10/02/00) (Paid petition for removal of Thurston County criminal case, remanded/ dismissed).
12. Stephenson v. Locke, Kitsap County & Washington State, C00-5272RJB (Termed 6/28/00) (Paid habeas action, consolidated with C99-5545RJB).
13. Stephenson v. Washington State & Kitsap County, C00-5502RJB (Termed 9/25/01) (Paid habeas action, dismissed without prejudice).
14. Stephenson & A-1 Credit Co. v. McElwee, C00-5181FDB (Termed 6/20/00) (Paid replevin action, dismissed for lack of jurisdiction).
15. Stephenson v. Gregoire, C00-5005FDB (Termed 4/20/00) (Misc. petition, dismissed).
16. Stephenson v. Hauge, C00-5001FDB (Termed 1/18/00) (Misc. petition, dismissed for lack of jurisdiction).
17. Carroll (Stephenson) v. Kitsap County, C99-5545RJB (Termed 8/11/00) (Paid petition for removal of Kitsap County criminal case & § 1983 action. Removal petition remanded/dismissed, § 1983 dismissed).
18. Stephenson v. Washington, C99-5640RJB (Termed 12/16/99) (Paid petition for removal of Kitsap County criminal case, remanded/ dismissed).
19. Stephenson v. Davis, C98-5373 FDB (Termed 9/22/98) (Paid habeas action,

referred to MJ Martinez (RSM) and dismissed without prejudice based upon R&R).

20. Stephenson v. Loginsky, C98-5296FDB (Termed 7/2/98) (Paid non-habeas action, dismissed for lack of jurisdiction).
21. Stephenson v. Wash. State Bar Ass'n, C97-5526FDB (Termed 12/18/97) (Paid non-habeas action, dismissed due to complaint deficiencies).
22. Stephenson v. Davis, C94-5537FDB (Termed 1/10/95) (Paid § 1983 action, apparent attempt to remove Kitsap criminal case. Action dismissed).

Received: 09 May 00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 2 of 16
MAY. 9.2000 11:34AM OF MA SECURITIES 248-0177 NO.052 P.2

**THE COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF THE SECRETARY OF THE COMMONWEALTH**
**SECURITIES DIVISION**
**ONE ASHBURTON PLACE**
**BOSTON, MASSACHUSETTS 02108**

| | |
|---|---|
| IN THE MATTER OF:<br><br>Global Prosperity Group<br>and all<br>Officers, Directors, Brokers, Agents,<br>Employees Thereof<br>Respondents | Docket No. E-98- 58 |

**FINAL ORDER**

On July 25, 1998, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth (the "Enforcement Section" and the "Division", respectively) served the Respondents with a Notice of an Adjudicatory Hearing and a copy of the Enforcement Section's Administrative Complaint and Ex Parte Order for a Temporary Order to Cease and Desist. Pursuant to M.G.L. c. 110A, the Massachusetts Uniform Securities Act (the "Act") and in accordance with 950 C.M.R. §10.06(e) the Respondents had twenty-one (21) days in which to answer the Administrative Complaint. The Respondents have failed to answer.

Pursuant to M.G.L. c. 30A, §10, and in accordance with 950 C.M.R. §10.06(e), the Respondent is deemed to be in default and the uncontroverted allegations contained in the administrative complaint filed July 24, 1998, shall be deemed admitted.

EXHIBIT
2

As a result, the Division finds the following:

1.    The Respondents operate a multi-level marketing program. The
      Respondents' operation, organization and business structure is an illegal
      pyramid scheme.

2.    The program being offered by the Respondents is an investment contract.
      Investment contracts are a security under the Act. The securities being
      offered by the Respondents are not registered as the Act requires.

3.    The Respondents are not registered as a broker-dealer or as agents of such
      as the Act requires.

4.    The above stated acts and omissions committed by the Respondent are in
      violation of M.G.L. c. 110A, §§101, 201 and 301.

5.    Based on the forgoing, ordering the Respondents to permanently cease and
      desist from further violating M.G.L. c. 110A, is in the public interest.

6.    This order is necessary and appropriate for the protection of investors and
      is consistent with the purposes fairly intended by the policy and provisions
      of M.G.L. c. 110A.




Therefore, the Division **HEREBY ORDERS** that:

1. The Respondents are deemed to be in default;

2. The allegations set forth in the Administrative Complaint are found as fact; and

3. The Respondents are ordered to permanently cease and desist from further violating the provisions of M.G.L. c. 110A.

**MASSACHUSETTS SECURITIES DIVISION**

John K. McCarthy
Acting Director
Massachusetts Securities Division
One Ashburton Place, Room 1701
Boston, MA 02108
617/727-3548

Dated this 31st day of August, 1998.

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 5 of 16
MAY. 9.2000 11:35AM COMM OF MA SECURITIES 248-0177 NO.052 P.5

## CERTIFICATE OF SERVICE

I, Patrick Smith, hereby certify that on this 31st day of August, 1998, I served a copy of the foregoing documents by depositing them at an official United States mail facility and sending them first class mail.

Patrick Smith
Patrick Smith

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 6 of 16
MAY. 9.2000 11:35AM COMM OF MA SECURITIES 248-0177 NO.052 P.6

THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE SECRETARY OF THE COMMONWEALTH
SECURITIES DIVISION
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

98 JUL 24 PM 4: 42

| | |
|---|---|
| IN THE MATTER OF:<br><br>Global Prosperity Group<br>and all<br>Officers, Directors, Brokers, Agents,<br>and Employees Thereof<br><br>Respondents | Docket No. E-98-58 |

**ADMINISTRATIVE COMPLAINT AND *EX PARTE* MOTION FOR A TEMPORARY ORDER TO CEASE AND DESIST**

**PRELIMINARY STATEMENT**

The Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth (the "Enforcement Section " and the "Division", respectively) has filed this Complaint in order to commence an adjudicatory proceeding against the above named respondents for violating the Massachusetts Uniform Securities Act, M.G.L. c. 110A (the "Act"). The Enforcement Section alleges that Global Investment Group ("Global") is currently in the process of fraudulently offering a security in the Commonwealth of Massachusetts.

The conduct of the respondent violates various provisions of the Act. This adjudicatory proceeding seeks, *inter alia*, a temporary and permanent order directing respondents to cease and desist from violations of the Act.

## JURISDICTION AND AUTHORITY

1. The Division is a department of the Secretary of the Commonwealth with jurisdiction over matters relating to securities and investments as provided by the Act. The Act authorizes the Division to regulate broker-dealers and agents located in or transacting business within the Commonwealth of Massachusetts.

2. Pursuant to the Act and M.G.L. c. 30A, the Division has the authority to conduct an adjudicatry proceeding to enforce the provisions of the Act and all the regulations promulgated thereunder. This proceeding is brought in accordance with §§204 and 407A of the Act.

3. Section 10.06 of the Regulations relates to the issuance of Temporary Orders to Cease and Desist and reads in pertinent part that "The Division may request a temporary order to cease and desist from the Presiding Officer. This request may be made *ex parte*."

4. The Enforcement Section specifically reserves the right to amend this complaint and/or to bring additional administrative complaints to reflect information developed during the ongoing investigation.

## RESPONDENTS

5. Global has a last known address of 2245 North Green Valley Parkway, Suite 640, Henderson, NV 89014.

## CONDUCT OF THE RESPONDENT

6. Global operates a multilevel marketing program. The initial investment made by a prospective investor is the purchase of a program. The program is any of a series of financial tapes and/or seminars. In order to become a "Director" in Global an

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 8 of 16
MAY. 9.2000 11:36AM COMM OF MA SECURITIES 248-0177 NO.052 P.8

investor is required to meet a one-time qualification of seven referral sales. Once the investor has referred a total of seven sales (purchases of a program) they become a qualified "Director for Life". "Directors" are then allowed to make a ninety percent (90%) profit on the sale of programs to other prospective investors.

7. Based upon information and belief, the focus of Global's organization and business structure is in the nature of a period scheme. Initial investors are enriched through an ever-increasing pyramid of investors. The primary focus of the Global organization is to produce an ever increasing number of "Directors" so that previous investors can share in the payments made each time seven new investors are brought into the pyramid. The "educational component" is merely a ruse to lure additional investors into the scheme.

8. Based upon information and belief, Global lures investors into the scheme with false guarantees of incredible wealth generated while working part-time. The inherent danger and fraud existing in a pyramid scheme is that at some point the scheme will reach a saturation point. When no new investors are available, the most recent investors will not receive the incredible wealth they have been guaranteed.

9. Global intends to hold a series of meetings during the weekend of July 25, 1998 in the Commonwealth of Massachusetts. If Global is allowed to recruit new prospects into Global then the citizens of Massachusetts suffer a high probability of irreparable harm.

10. Based upon the review and analysis of the Division the Respondents marketing program constitutes a security under the Act. The securities being offered by Global are neither registered nor exempt therefrom as required by the Act.

11. Global is not registered, as required by law, as a broker-dealer with the Division.

12. The State of South Dakota, Department of Commerce & Regulation, Division of Securities issued a cease and desist order against Global on February 10, 1998.

13. The State of Michigan, Department of the Attorney General, Consumer Protection Division issued a cease and desist order against Global on April 24, 1998.

14. The State of North Dakota, Securities Commissioner issued a series of cease and desist orders against Global on April 3,1998, April 17, 1998, and April 20, 1998.

**CAUSES OF ACTION**

**COUNT I**

15. The Division realleges and restates the allegations and facts set forth in paragraphs 1 through 14.

16. Section 101 of the Act states that "[I] t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 10 of 16
MAY. 9.2000 11:36AM COMM OF MA SECURITIES 248-0177 NO.052 P.10

17. Global's conduct as described above constitutes a violation of M.G.L. c. 110A, §101.

COUNT II

18. The Division realleges and restates the allegations and facts set forth in paragraphs 1 through 17.

19. Section 201(a) of the Act states that "[I]t is unlawful for any person to transact business in the commonwealth as a broker-dealer of agent unless he is registered under this chapter."

20. The failure of the Respondent to register under the Act constitutes a violation of M.G.L. c. 110A, §201(a).

COUNT III

21. The Division realleges and restates the allegations and facts set forth in paragraphs 1 through 20.

22. Section 301 of the Act states that "[I]t is for any person to offer or sell any security in the commonwealth unless (1) it is registered under this chapter or (2) the security or transaction is exempted under section 402."

23. The failure of the Respondent to register the security under the Act or perfect an exemption therefrom constitutes a violation of M.G.L. c. 110A, §301.

PUBLIC INTEREST

24. It is in the public interest and will protect Massachusetts's investors to order the respondent to permanently cease and desist from violations of the Act for each, any and all of the reasons set forth above.

5

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 11 of 16
MAY. 9.2000 11:36AM COMM OF MA SECURITIES 248-0177 NO.052 P.11

## SANCTIONS AND REMEDIES

25. Section 407(a) of the Act states that "[I]f the secretary determines, after notice and opportunity for hearing, that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule or order issued thereunder, he may order such person to cease and desist from such unlawful act or practice and may take such affirmative action, including the imposition of an administrative fine, the issuance of an order for an accounting, disgorgement or rescission or any other such relief as in his judgment may be necessary to carry out the purposes" of the Act.

## RELIEF REQUESTED

WHEREFORE, the Enforcement Section of the Division requests that the Director or Hearing Officer take the following action:

A. Find as facts the allegations as set forth in paragraphs 1 through 25 of this Administrative Complaint;

B. Find that all the sanctions, remedies and relief as detailed herein are in the public interest and necessary for the protection of Massachusetts investors;

C. Temporarily Order the respondents to cease and desist from further violations of M.G.L. c. 110A, et seq.;

D. Permanently Order the respondents to cease and desist from further violations of M.G.L. c. 110A, et seq.;

E. Take such further action as may be deemed just and appropriate.

The Enforcement Section hereby files a Motion that the Orders in paragraphs A,B and C ,above, be issued on a *Ex Parte* Temporary basis in view of following facts that indicate that any delay in issuing these Orders will likely result in irreparable harm to the public interest:

A. The on-going nature of the Respondents' alleged conduct;

B. The seriousness of the type of fraudulent activity alleged in the Complaint;

C. The likelihood that the Respondent may defraud other Massachusetts residents; and

D. The likelihood of the Enforcement Section's success on the merits of the Administrative Complaint.

ENFORCEMENT SECTION
MASSACHUSETTS SECURITIES DIVISION

By: [signature]
Thomas Ryan
Enforcement Attorney

[signature]
Matthew Nestor
Chief of Enforcement

Dated this 24th day of July 1998.

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 13 of 16
MAY. 9.2000 11:37AM COMM OF MA SECURITIES 248-0177 NO.052 P.13

**COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF THE SECRETARY OF THE COMMONWEALTH**
**SECURITIES DIVISION**
**ONE ASHBURTON PLACE 17TH FLOOR**
**BOSTON, MASSACHUSETTS 02108**

JUL 26 PM 4:42

IN THE MATTER OF:

Global Prosperity Group
and all
Officers, Directors, Brokers, Agents, and Employees Thereof

Respondents.

No. E-98-58

**NOTICE OF AND ORDER FOR ADJUDICATORY PROCEEDINGS AND ALLOWANCE OF *EX PARTE* MOTION TO CEASE AND DESIST**

1. William Francis Galvin, Secretary of the Commonwealth, by his Securities Division, hereby commences an adjudicatory Proceeding against the above-captioned Respondents.

2. This Proceeding is commenced pursuant to the provisions of Massachusetts General Laws chapter 30A and chapter 110A (the "Act") and 950 Code of Massachusetts Regulations 10.00 *et seq.* (the "Rules").

3. Section 407A of the Act provides in pertinent part:

> *(a)[i]f the Secretary determines, after notice and opportunity for hearing, that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of [the Act] or any rule or order issued thereunder, he may order such person to cease and desist from such unlawful act or practice and may take such affirmative action, including the imposition of an administrative fine, the issuance of an order for an accounting, disgorgement or rescission or any other such relief as in his judgment may be necessary to carry out the purposes of [the Act].*

Received: 09.May.00 10:39 AM From: 61724801/7 To: Get faxes by email. Free. eFax.com Page: 14 of 16
MAY. 9.2000 11:37AM COMM OF MA SECURITIES 248-0177 NO.052 P.14

> *(b) If the secretary makes written findings of fact that the public interest will be irreparably harmed by delay in issuing an order under subsection (a), the secretary may issue a temporary cease and desist order.*

> Section 10.06 of the Rules relates to issuance of Temporary Orders to Cease and Desist and reads in pertinent part:

> *"...[T]he Division may request a temporary order to cease and desist from the Presiding Officer. This request may be made ex parte.*

5. The Enforcement Section of the Massachusetts Securities Division has filed an Administrative Complaint and an *Ex Parte* Motion to Cease (the "Complaint"). I have read the Enforcement Section's Complaint and the facts set forth therein and after careful consideration, I make the following findings:

6. Solely for the purposes of reaching a determination whether to allow the *Ex Parte* Motion for a Temporary Order to Cease and Desist, I accept the allegations and statements in the Complaint as true.

7. Accepting those facts as true, I find that it is likely that the Enforcement Section will prevail at a subsequent hearing on the merits of this matter.

8. Again, accepting those facts as true for this limited purpose, I find that Massachusetts investors are likely to be irreparably harmed by any delay in issuing an Order directing the Respondents to Temporarily Cease and Desist from further violations of the Act and the Regulations.

9. I make this finding because of:

A. The on-going nature of the Respondents' alleged conduct;

B. The seriousness of the type of fraudulent activity alleged in this Complaint;

2

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 15 of 16
MAY. 9.2000 11:37AM COMM OF MA SECURITIES 248-0177 NO.052 P.15

C. The likelihood that the Respondents may defraud other Massachusetts residents; and

D. The likelihood of the Enforcement Section's success on the merits of the Administrative Complaint.

10. Further, in its Complaint, the Enforcement Section has set forth sufficient facts to establish *prima facie* that securities as defined by §401 of the Act were offered and sold or that Respondents have a current intention to sell said securities.

11. In its Complaint, the Enforcement Section has set forth sufficient facts to establish *prima facie* that securities were sold or that respondents have an intent to sell to or by persons within the ambit of §414 of the Act.

12. In its Complaint, the Enforcement Section has set forth sufficient facts to establish *prima facie* that Respondents are involved in the offer and/or sales of these securities.

13. In its Complaint, the Enforcement Section has set forth sufficient facts to establish a *prima facie* case that Respondents may have violated §101 of the Act.

14. THEREFORE: Having made the above findings of fact and determining that it is in the public interest and necessary for the protection of investors and consistent with the purposes fairly intended by the Act, **IT IS HEREBY ORDERED**:

A) Respondents shall immediately Cease and Desist from further violations of the Act including, but not limited to, conducting any educational seminars within the Commonwealth of Massachusetts;

C) The above Orders are hereby issued on an *ex parte* Summary basis and are effective immediately with the signing of this Order;

Received: 09.May.00 10:39 AM From: 6172480177 To: Get faxes by email. Free. eFax.com Page: 16 of 16
MAY. 9.2000 11:38AM COMM OF MA SECURITIES 248-0177 NO.052 P.16

D) A copy of the Enforcement Section's Complaint and this Order shall immediately be served on the Respondents as provided for by the Rules;

E) The Respondents shall be notified, and by delivery of this Order they are hereby notified, that pursuant to section 407A of the Act and section 10.00 *et seq.* of the Rules, they have a right to request an administrative hearing and that such hearing must be set down within fifteen (15) days after receipt by this Division of their written request for such hearing. Said hearing will be held to determine if this Order should become permanent and final.

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH

by ______________________
John K. McCarthy, Esq.
Acting Director
Massachusetts Securities Division
One Ashburton Place, Room 1701
Boston, MA 02108

Signed this 24th day of July, 1998

**NOTICE:**

**FAILURE BY A RESPONDENT TO FILE AN ANSWER TO THIS NOTICE OF ADJUDICATORY HEARING AND ATTACHED ADMINISTRATIVE COMPLAINT WITHIN TWENTY-ONE (21) DAYS AFTER ITS SERVICE WILL BE CONSIDERED A DEFAULT.**

**THIS MAY RESULT IN THE ENTRY OF A DEFAULT JUDGMENT OR SUCH OTHER ACTIONS AGAINST THE RESPONDENT AS THE PRESIDING OFFICER OF THESE PROCEEDINGS MAY DEEM APPROPRIATE.**

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL ANDERSEN and LORENZO J. LAMANTIA, individually and on behalf of the members of the Institute for Global Prosperity, *Plaintiffs-Appellants,*<br>v.<br>UNITED STATES OF AMERICA, NAMED and UNNAMED AGENTS of the INTERNAL REVENUE SERVICE CRIMINAL DIVISION, IRS Special Agent THOMAS WOURGIOTIS, IRS Special Agent TOM OENBRINK, IRS Special Agent PAULA LURVEY, IRS Special Agent JEFFREY HOLM, IRS Special Agent JULIE LAU, IRS Special Agent CHARLES PHILLIPS, IRS Special Agent JUDY O'BRIANT and SHOSHANNA SZUCH, *Defendants-Appellees.* | No. 01-56900<br>D.C. No. CV-01-08427-CAS<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
April 11, 2002—Pasadena, California

Filed July 30, 2002

Before: Stephen Reinhardt and Susan P. Graber, Circuit Judges, and Roger L. Hunt,* District Judge.

*The Honorable Roger L. Hunt, United States District Court for the District of Nevada, sitting by designation.

EXHIBIT
3

10594 ANDERSEN v. UNITED STATES

Opinion by Judge Graber;
Dissent by Judge Reinhardt

## COUNSEL

William A. Cohan, William A. Cohan, P.C., San Diego, California, for the plaintiffs-appellants.

Gretchen M. Wolfinger, Tax Division, U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

## OPINION

GRABER, Circuit Judge:

Plaintiffs Andersen and LaMantia, on behalf of themselves and the members of the Institute for Global Prosperity (IGP), sued the United States and its agents. Plaintiffs alleged that the government conspired to violate their constitutional rights and those of IGP's members when the government executed eight search warrants and seized, among other things, IGP's membership lists and literature. Plaintiffs moved for an injunction (1) to prevent the government from conducting further searches or seeking further information, (2) to prevent the government from using the information obtained from search warrants already executed, and (3) to require the government

to return the seized property. The district court denied the motion. We dismiss Plaintiffs' appeal for lack of jurisdiction.

## FACTS AND PROCEDURAL HISTORY

Plaintiffs are leaders of IGP, an organization that distributes "educational, political, religious and philosophical materials in the form of books and CDs, much of which is critical of the United States' financial and taxing policies." Plaintiffs and other IGP leaders are currently under investigation[1] for tax-related crimes.

Between February 28, 2001, and September 25, 2001, the government executed eight search warrants on Plaintiffs' residences and on IGP offices across the country. The warrants sought a broad range of financial records. The warrants also sought material under the heading "[IGP] related records/ evidence," including

> applications for membership, membership cards, membership agreements, confidentiality agreements, promotional literature (letters, flyers, brochures, videotapes and audiotapes), scripts used during telephone solicitations, newspaper advertisements, lists of names or addresses or telephone numbers (or other identifying data) of members, prospective members or Qualified Retailers, records reflecting attendance at [IGP] seminars, videotapes/audiotapes of [IGP] leaders/members at [IGP] seminars, and audiotapes of [IGP programs].

On September 28, 2001, Plaintiffs filed this action in fed-

[1]At oral argument, the parties agreed that we should assume for the purpose of decision that there is a grand jury investigation in progress. Although the government makes no factual representations on this issue, we so assume. *See* Fed. R. Crim. P. 6(e) (providing for secrecy of grand jury proceedings).

eral district court, alleging claims of (1) conspiracy to violate Plaintiffs' First and Fourth Amendment rights and the First Amendment rights of members and associates of IGP and (2) "willful, wanton and malicious violations" of Plaintiffs' individual Fourth Amendment rights.

At the same time, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. They sought to prohibit the United States from

> (a) conducting any further searches and seizures or otherwise seeking or acquiring indicia of association with plaintiffs and/or IGP's members and/or associates; and (b) any use or dissemination to any person, entity or agency whatsoever of any membership and/or associates' identities or information already obtained during the searches and seizures at issue . . . .

Plaintiffs also sought a permanent injunction ordering the return of all IGP-related property that had been seized pursuant to the warrants.

The district court denied the request for a temporary restraining order and, later, denied Plaintiffs' motion for a preliminary injunction. Plaintiffs timely filed a notice of appeal.

## DISCUSSION

As a threshold matter, we must decide whether we have jurisdiction to review the district court's denial of the preliminary injunction.[2] Generally, we may review only final orders of the district court. 28 U.S.C. § 1291.

---

[2]For jurisdictional purposes, we are obliged to determine the finality of a decision on appeal. *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1136-37 (9th Cir. 2001). We review *de novo* questions of our jurisdiction. *Didrickson v. United States Dep't of Interior*, 982 F.2d 1332, 1337 (9th Cir. 1992).

**[1]** The denial of a preliminary injunction is one of the few kinds of appealable interlocutory orders. 28 U.S.C. § 1292(a)(1). However, here, Plaintiffs' motion sought relief typically provided by Federal Rule of Criminal Procedure 41(e). Although styled as an action for an "injunction," perhaps because of the general rule noted above, the motion *in substance* sought the return of property that had been seized pursuant to a warrant. Rule 41(e) controls the procedure for obtaining that form of relief. The distinction between injunction proceedings in general and Rule 41(e) motions in particular is important, because the denial of a motion under Rule 41(e) usually is not appealable. *DiBella v. United States*, 369 U.S. 121, 131-32 (1962)

**[2]** The substance of the motion, not its form, controls its disposition. *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000) ("[T]he label attached to a motion does not control its substance." (citation and internal quotation marks omitted)); *Hasbrouck v. Texaco, Inc.*, 879 F.2d 632, 635 (9th Cir. 1989) ("The nomenclature the movant uses is not controlling. This court must decide whether a motion, however styled, is appropriate for the relief requested." (citations omitted)). In accordance with that principle favoring substance over form, we have construed a motion that sought injunctive relief of the kind provided by Rule 41(e) as a Rule 41(e) motion, notwithstanding the motion's label. *See, e.g., DeMassa v. Nunez*, 747 F.2d 1283, 1291 (9th Cir. 1984) (Ferguson, J., dissenting), *reh'g granted on other grounds*, 770 F.2d 1505 (9th Cir. 1985) (per curiam) (*DeMassa I* and *DeMassa II*, respectively). Because Plaintiffs sought the relief provided by Rule 41(e), we construe their motion as one properly brought under that rule.

**[3]** The Supreme Court has held that the courts of appeal have jurisdiction to review decisions on Rule 41(e) motions "[o]nly if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* against the

movant." *DiBella*, 369 U.S. at 131-32.[3] As we recently recognized:

> This rule reflects the careful balancing between two competing interests: On the one hand, appellate courts should act to prevent the deprivation of seized property that is sorely needed when those deprived have no other avenues for relief. On the other hand, the appeal of a lower court's decision denying a return of property can add uncertainty and delay to an ongoing parallel criminal proceeding, especially if the legality of the search is the critical issue in the criminal trial.

*Bridges v. United States (In re 3021 6th Ave. N.)*, 237 F.3d 1039, 1041 (9th Cir. 2001).

In this case, Plaintiffs' motion seeks the return of the seized property but also asks for significant additional relief. And, there is an ongoing criminal investigation that targets Plaintiffs. In the circumstances, Plaintiffs fail both parts of *DiBella*'s test, and they therefore cannot establish the exception to the general rule that motions like theirs are unappealable.

**[4]** As for the first criterion, in addition to demanding the return of their property, Plaintiffs seek to enjoin the IRS from conducting any future searches or seizures. Further, they seek to enjoin the IRS from using the material that already was seized. By asking for exclusion of evidence and by seeking to prevent any further searches, the complaint seeks relief beyond "solely" the return of property.

[3]The dissent relies on two brief passages in *DiBella*, 369 U.S. at 124-26, to argue that it "do[es] not set forth an absolute rule prohibiting all interlocutory appeals in cases involving criminal proceedings." Dissent at 10607. In the cited passages, however, the *DiBella* Court was merely describing, as background, extant exceptions to the finality rule, none of which applies here. The Court went on to state the applicable and clear two-part test that we summarize in the text above. 369 U.S. at 131-32.

**[5]** As for the second criterion, an ongoing grand jury investigation constitutes a " 'criminal prosecution *in esse*' " under *DiBella*. *DeMassa I*, 747 F.2d at 1291 (Ferguson, J., dissenting) (quoting *DiBella*, 389 U.S. at 132). In this circuit, rulings on motions for return of property are unappealable when there is an ongoing grand jury investigation. *Id.*

Indeed, *DeMassa I* directly controls this case.[4] In *DeMassa I*, we construed a motion for a preliminary injunction as a Rule 41(e) motion. Because one of the plaintiffs was the target of an ongoing grand jury investigation, we held that we lacked jurisdiction to review the order denying injunctive relief. *See id.* at 1287 (stating that "[t]his circuit has joined those courts adopting a liberal definition of when a proceeding is *in esse* and has also concluded that an order denying the return of seized property is not appealable when a grand jury proceeding against the movant is underway").

*DeMassa I* clearly contemplates that grand jury proceedings constitute criminal proceedings for the purpose of determining appealability. This interpretation is consistent with

[4]In *DeMassa I*, we held that we lacked jurisdiction to review the Fourth Amendment claims of a lawyer whose offices had been searched and whose files had been seized. Because that lawyer was the target of an ongoing grand jury investigation, we concluded that *DiBella* controlled, and we had no jurisdiction. 747 F.2d at 1287. However, in *DeMassa II*, we held that we *did* have jurisdiction to review the Fourth Amendment claims of the clients who were also individually named plaintiffs. 770 F.2d at 1506. We reasoned that those clients were "strangers to any potential indictments" and, thus, their claims were reviewable under *DiBella* because there was no criminal proceeding *in esse*. *Id.*

The clients in *DeMassa II* were named plaintiffs in the action. By contrast, the IGP is not a plaintiff, nor are any individual members named as plaintiffs except Andersen and LaMantia. Andersen and LaMantia purportedly assert rights on the membership's behalf. Without jurisdiction over any of Andersen's or LaMantia's claims, however, we cannot assert jurisdiction over the membership's potential *derivative* claims, even if Andersen and LaMantia otherwise would be entitled to bring such claims in a representative capacity.

*DiBella*, which held that "the mere circumstance of a *pre-indictment* motion does not transmute the ensuing evidentiary ruling into an independent proceeding begetting finality even for purposes of appealability. Presentations before a . . . grand jury are parts of the federal prosecutorial system leading to a criminal trial." *DiBella*, 369 U.S. at 131 (citations omitted) (emphasis added).

Plaintiffs ask for an exception to the rule of nonappealability on the ground that their First Amendment rights allegedly have been infringed. Although *DiBella* and *DeMassa* dealt with Fourth Amendment rights, the broad proscription against interlocutory review that those cases establish applies with equal force to First Amendment claims.

We recognize that First Amendment rights may be chilled when the government seizes information about the members of an organization. *NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958). Nonetheless, for three reasons, we conclude that the Supreme Court would apply the *DiBella* rule even to a First Amendment claim.

**[6]** First, the Court's logic in *DiBella* retains its efficacy in this context. The Court gave two reasons for refusing to create an exception to the general finality rule: The Court was concerned with impeding the criminal justice process, including the Sixth Amendment right to a speedy trial, 369 U.S. at 124, 126, and it concluded that Rule 41(e) motions are not independent of the associated criminal investigation and thus not severable from the "larger litigious process," *id.* at 127 (citation and internal quotation marks omitted). In other words, permitting an appeal from the district court's decision on a Rule 41(e) motion is likely to affect the integrity of the investigation and potential criminal trial. *Id.* These concerns are equally valid whatever the specific nature of the constitutional right that the potential criminal defendant seeks to vindicate.

**[7]** Second, the bar against an interlocutory appeal means only that review on the merits is postponed, not foreclosed.

Plaintiffs can obtain appellate review on the merits of their claims when the district court has taken *final* action, either in the context of a criminal conviction or otherwise.

**[8]** Third, we note by way of analogy the Supreme Court's application of a procedural bar even in the face of substantial First Amendment claims. In *United States v. American Friends Service Committee*, 419 U.S. 7 (1974) (per curiam), the Supreme Court reversed an injunction that had been granted on First Amendment grounds. Employees of the American Friends Service Committee, who were Quakers, obtained an injunction that prevented the government from enforcing mandatory tax-withholding requirements. *Id.* at 9. Because of their religious objection to the war in Vietnam, the employees contended that the Free Exercise Clause protected their right to express those beliefs by refusing to pay a portion of their taxes. *Id.* at 7-8. Despite the strong First Amendment interests at stake, the Court imposed a statutory bar against equitable relief. Construing the Anti-Injunction Act, 26 U.S.C. § 7421(a),[5] the Court reaffirmed the principle that "the constitutional nature of a taxpayer's claim" under the First Amendment was irrelevant to its analysis. *Am. Friends*, 419 U.S. at 11 (citation and internal quotation marks omitted).

**[9]** We express no opinion on whether the Anti-Injunction Act would bar Plaintiffs' suit on the merits; it is not clear whether it would or would not. *See Church of Scientology v. United States*, 920 F.2d 1481, 1486 (9th Cir. 1990) (noting that the Act extends to suits that target any activity that is " 'intended to or may culminate in the assessment or collection of taxes' " (quoting *Blech v. United States*, 595 F.2d 462, 466 (9th Cir. 1979))). However, analogizing from *American*

[5]Subject to certain statutory exceptions not applicable here, the Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

*Friends*, we conclude that no exception to the procedural bar may be made here on the ground that Plaintiffs assert First Amendment as well as Fourth Amendment interests.

Although the dissent emphasizes the compelling nature of First Amendment claims, our jurisdiction is bounded by the clear rule in *DiBella*, as interpreted by this court in *DeMassa*. We are not free to ignore those precedents defining our jurisdiction simply because the subject matter of the underlying complaint tempts us to do so. That is true even in the *Younger* abstention context, on which the dissent relies by analogy. *See Younger v. Harris*, 401 U.S. 37 (1971) (limiting *Dombroski v. Pfister*, 380 U.S. 479 (1965), to its facts and abstaining despite an underlying First Amendment claim).

## CONCLUSION

**[10]** Plaintiffs' motion for a preliminary injunction was, in substance, a motion for return of property under Federal Rule of Criminal Procedure 41(e), but it sought additional relief and was tied to an ongoing grand jury investigation. Therefore, the district court's order denying the injunction is not a final, appealable order, and we lack jurisdiction to review it.

APPEAL DISMISSED.

---

REINHARDT, Circuit Judge, dissenting:

The majority asserts that it merely applies the clear rule of *DiBella* and *DeMassa* to the case at hand. The rule is hardly clear and in my view is not applicable to claims of serious, imminent, and irreparable violations of First Amendment rights. Accordingly, I dissent.

The majority treats the appellants' motion as simply a "functional" 41(e) motion that, under the law of our circuit,

is tied to an ongoing criminal proceeding and thus is unappealable. In so doing, the majority fails to consider adequately the nature and importance of the subject matter of the appellants' motion. The appellants seek to enjoin the government from seizing and making use of their membership lists—lists of the names and other identifying information regarding all current and prospective members of the Institute for Global Prosperity (IGP).

Membership lists have a long and unique history in our constitutional jurisprudence, and the seizure of such items implicates the rights of freedom of association and freedom of speech under the First Amendment. In *NAACP v. Alabama*, 357 U.S. 449 (1958), the government action at issue, as in this case, was the compelled disclosure of the organization's membership lists. *Id.* at 460. The Court stated that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association." *Id.* Thus, the Court recognized that the destruction of members' anonymity may hamper their individual rights to associate freely. *See Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963) (stating that right of association includes protection of privacy of association); *NAACP*, 357 U.S. at 462 ("This Court has recognized the vital relationship between freedom to associate and privacy in one's associations.").

The concern for the protection of the right of free association, and the ability to maintain one's privacy in that association, is especially present in political, economic, and religious organizations, *NAACP*, 357 U.S. at 460, including tax protester groups. *First Nat'l Bank v. United States*, 701 F.2d 115, 118 (10th Cir. 1983) ("The chilling effect of a summons served by an IRS agent to obtain membership records of a tax protester group . . . [is] readily apparent.") (internal quotation marks omitted). It is especially important that we be vigilant in our protection "when a group espouses dissident beliefs." *NAACP*, 357 U.S. at 462. Accordingly, a government action

that directly, or indirectly, limits the freedom to associate "is subject to the closest scrutiny." *Id.* at 461; *see also Bates v. Little Rock*, 361 U.S. 516, 523 (1960) (stating that associational rights are protected "from being stifled by more subtle governmental interference").

Here, the appellants, who head a tax protester organization, assert their rights to association and freedom of speech— rights that we must be particularly vigilant to protect against unwarranted governmental intrusion. They allege that those rights are currently being violated, that there will be additional violations in the near future, and that the government's actions, if unreviewed by this court, will have an immediate and serious chilling effect upon the organization and its members. The only question addressed in the majority opinion, and in this dissent, is whether we have the ability to consider appellants' constitutional claims now, or whether they must await appellate review for an indefinite period of time, perhaps for a significant number of years, by which time the irreparable damage that is attendant on the alleged First Amendment violation will likely have been done. The majority concludes that "later"—no matter how much later—is good enough. I disagree.

As stated by the majority, *DiBella* and *DeMassa* together stand for the proposition that a motion for the return of property is generally not appealable on an interlocutory basis if it is tied to a "criminal prosecution *in esse* against the movant." *DiBella v. United States*, 369 U.S. 121, 132 (1962); *see also DeMassa v. Nunez*, 747 F.2d 1283, 1287 (9th Cir. 1984). The stated purpose behind this rule is to avoid interference with ongoing criminal cases, as well as to discourage piecemeal litigation and delays in the administration of justice. *DiBella*, 369 U.S. at 124.

The majority asserts that its decision is compelled by *DiBella*, as interpreted by *DiMassa*. I disagree. Neither *DiBella* nor *DeMassa* addressed the First Amendment, and

neither case involved membership lists. Nor did the petitioner in either case seek an injunction to prevent the further seizure of First Amendment materials, as do the appellants here. To the contrary, both *DiBella* and *DeMassa* involved petitioners who instituted collateral civil proceedings to assert violations of their Fourth Amendment rights resulting from searches and seizures of drugs and related materials and stolen property, as well as a gun and devices used in a robbery. *See DiBella*, 369 U.S. at 122 and 290 F.2d 166, 167 n.1 (5th Cir. 1961); *DeMassa*, 747 F.2d at 1285 (also asserting Fifth and Sixth Amendment). The Supreme Court and this court have said that because Fourth Amendment questions arise regularly in criminal trials and because their resolution may determine the outcome of the criminal matter, they represent "but a step in the criminal case" and should ordinarily be resolved in the course of the criminal proceedings. *DiBella*, 369 U.S. at 131-32; *DeMassa*, 747 F.2d at 1288. While I agree that this general principle ordinarily holds true for claims of Fourth Amendment violations, I do not agree that it is applicable to bona fide First Amendment claims, including claims involving past and future seizures of membership lists and similar constitutionally protected materials.

*DiBella* and *DeMassa* do not set forth an absolute rule prohibiting all interlocutory appeals in cases involving criminal proceedings. In *DiBella*, the Court stated that Congress intended such appeals should be permitted where the harm of "error unreviewed before the judgment is definitive and complete [is] greater than the disruption caused by immediate appeal." *Id.* (internal citation omitted). The Court also stated that "immediate appeal has been allowed from an order recognized as collateral to the principal litigation . . . when the practical effect of the order will be irreparable by any subsequent appeal." *Id.* at 126 (internal citation omitted). These exceptions fit within a general public policy permitting interlocutory appeals in criminal cases where rights of exceptional importance are at stake, and where resolution of those rights cannot wait until the close of criminal proceedings. *See, e.g.*,

*Helstoski v. Meanor*, 442 U.S. 500 (1979) (permitting immediate appeal of criminal defendant's motion to dismiss under the Speech or Debate Clause); *Abney v. United States*, 431 U.S. 651 (1977) (permitting immediate appeal of criminal defendant's motion to dismiss on double jeopardy grounds); *Stack v. Boyle*, 342 U.S. 1 (1951) (permitting immediate appeal of criminal defendant's motion to reduce bail); *see also* 18 U.S.C. § 3731 (permitting prosecution to appeal immediately order dismissing indictment, granting motion to suppress, or granting motion for return of property). In my view, the First Amendment right to association is one of those questions of exceptional importance that must be resolved as soon as possible, without waiting for the end of what may be interminable criminal proceedings. *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 55 (1992) ("Adjudicating the proper scope of First Amendment protections has often been recognized by this Court as a 'federal policy' that merits application of an exception to the general finality rule."); *United States v. P.H.E., Inc.*, 965 F.2d 848, 857 (10th Cir. 1992) ("[F]ederal courts have asserted jurisdiction in a number of contexts involving non-final orders, in which the proceedings complained of infringed upon First Amendment rights").

In this case, the "criminal proceeding" is the beginning of a grand jury investigation.[1] At that stage of the proceedings,

[1]As the majority states, under Ninth Circuit law, a criminal proceeding is *in esse* once a grand jury investigation has begun. *DeMassa*, 747 F.2d at 1287. The Sixth, Seventh, Eighth, and Tenth Circuits take a different position, although the Second, Third, and Fourth Circuits share our view. The circuits that disagree with us require charges to be filed before a criminal proceeding is deemed "pending." *See Blinder, Robinson & Co. v. United States*, 897 F.2d 1549, 1554 (10th Cir. 1990); *In re Grand Jury Proceedings*, 716 F.2d 493, 496 (8th Cir. 1983); *Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982); *Mr. Lucky Messenger Serv., Inc. v. United States*, 587 F.2d 15, 16 (7th Cir. 1978). *But see United States v. Regional Consulting Serv.*, 766 F.2d 870 (4th Cir. 1984); *United States v. Furina*, 707 F.2d 82 (3d Cir. 1983); *Standard Drywall, Inc. v. United States*, 668 F.2d 156 (2d Cir. 1982).

there is no certainty that a criminal indictment will ever issue, and even if probability weighs in favor of an indictment issuing eventually, there is no telling how long that might take. The target of a grand jury investigation may have to wait a fair number of years before he will have the chance to raise his First Amendment claims and, under the majority's holding, he will be unable during that entire time to take any legal action to prevent the continuing violation of his rights. In my view, an immediate appeal is necessary to afford the appellants a forum in which to assert their First Amendment rights before irreparable injury results.

The Supreme Court has held that when the government seizes material that is protected by the First Amendment, courts must provide increased oversight to ensure that First Amendment rights are not harmed. *See New York v. P.J. Video*, 475 U.S. 868, 873 (1986). For example, a seizure of obscene materials cannot stand absent a warrant and a prompt postseizure judicial determination of its legality. *Id.*, citing *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636 (1968). In keeping with this idea, circuit courts have held that federal courts may exercise their equitable jurisdiction in favor of a potential defendant, who has not yet been indicted and who alleges First Amendment violations, because "[t]he promise of review of a prior restraint at some indefinite, future time does not meet constitutional requirements." *Kitty's East v. United States*, 905 F.2d 1367, 1372 (10th Cir. 1990).

In the related *Younger* abstention context, the Supreme Court has held that the exercise of federal jurisdiction may be appropriate if a violation of First Amendment rights is alleged, even though under normal circumstances it would not be. *See Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965) (stating that abstention is inappropriate in cases where the threat of criminal prosecution itself chills freedom of expression). This is because sometimes First Amendment rights cannot adequately be addressed in the state criminal proceeding. *Id.* at 490-91; *see also Kaylor v. Fields*, 661 F.2d 1177, 1182

(8th Cir. 1981) (finding *Younger* abstention inappropriate as there was "no assurance that [plaintiff] could assert this free-speech claim as a defense to the crime . . . with which she is charged"); *Gold v. State of Connecticut*, 531 F.2d 91 (2d Cir. 1976) (per curiam) (stating in *Younger* abstention context that "federal review may be available where such orders affect First Amendment rights not capable of vindication through direct appeal from conviction"), citing *Gerstein v. Pugh*, 420 U.S. 103, 108 n.9 (1975).[2] Here, the exercise of appellate jurisdiction is justified for similar reasons.

*United States v. American Friends Service Committee*, 419 U.S. 7 (1974), the only First Amendment case on which the majority relies, does not alter the analysis in our case. Nowhere does *American Friends* discuss the First Amendment. Nor does it address an appellate court's jurisdiction to hear an interlocutory appeal. *American Friends* simply stands for the proposition that constitutional claims do not constitute exceptions to the Anti-Injunction Act. *Id.* at 15. The question before us, of course, is not whether the Anti-Injunction Act bars appellants' First Amendment claims (and I think it likely does not), but whether we have jurisdiction to decide on this appeal whether it does, or whether Appellants' claims should be rejected on other grounds. On that jurisdictional question, I believe that First Amendment principles are controlling.

Appellants have alleged that their First Amendment associational rights, and those of IGP's members, have been and are currently being chilled by the government's continuing possession of IGP's membership lists. In my view, the importance of this claim—and the need to resolve it expeditiously

[2]In *World Famous Drinking Emporium v. City of Tempe*, 820 F.2d 1079, 1082 (9th Cir. 1987), this circuit held that the petitioner's First Amendment challenge under § 1983 was barred by *Younger*. However, in that case the plaintiffs were also defendants in state court criminal and civil enforcement proceedings, so they had ample opportunity to raise their First Amendment challenge in the ongoing state court proceedings. Here, by contrast, no indictment has issued against Appellants.

—outweighs any theoretical disruption to the grand jury proceedings that may be occasioned by an immediate appeal. I would hold that this is the kind of claim contemplated by *DiBella*'s exceptions, and therefore that we have jurisdiction to review it. I respectfully dissent from the majority's decision to dismiss the appeal.

# BE TAX EXEMPT

## INTRODUCTION PAGE

WHY PAY MORE TAXES THAN YOU HAVE TO?

WOULD YOU LIKE AN INSTANT PAY RAISE?

**WE CAN HELP YOU STRUCTURE YOUR FINANCIAL AFFAIRS SO THAT YOU *NEVER HAVE TO PAY INCOME TAXES AGAIN!*... ...LEGALLY, ETHICALLY AND NON-CONFRONTATIONALLY.**

***SOUND TO GOOD TO BE TRUE? THEN READ ON...***

### WHAT WE OFFER

We provide clients with expert tools, education, consultation, and full support on how to legally ***Zero Thier Tax Liability***. What this means is that a client will then be able to operate in a totally income tax free environment forever. Depending upon your financial situation and personal preference, we offer and support over 6 different methods to help a client become tax free....no matter what they do or how much they make. Our tax elimination and reduction strategies apply to personal income tax, business, capitol gains and inheiritence taxes. One particular method for eliminating income taxes, "filing a tax statement" in lieu of a tax return, is one of our more popular strategies and is the main theme of this site. More information on this strategy and how it works canbe found at the end of this web page.

PINNACLE QUEST

### START HERE

1.850.654.7727 x2002

This PQI overview is available 24 hours a day.
After listening to this overview about our products and services, you may then call me to get your questions answered or get started.

### WHO WE ARE

EXHIBIT
4

**We are a group of international financial experts and professionals that have been gathered to provide the best financial education, insider**


**strategies and support in the following areas:**

**An Unprecedented Financial and Freedom Education**

**Complete Asset Protection**

**Estate Planning**

**Credit Card Debt Elimination w/o Bankruptcy**

**Freedom and Privacy Protection**

**High Yield Investing (Short & Long Term)**

**Reducing or Eliminating Capitol Gains and Inheritance Taxes**

**Moving IRAs, 401Ks, and RRSP Funds Without Penalty**

**Establishing and Structuring Trusts, IBC's, and LLC's**

**Offshore Banking Strategies**

**Becoming Lien, Levy, and Judgement Proof**

**Protection Against Traffic Tickets and Frivolous Lawsuits**

**and more... "Knowledge is Power"**

We are PQI Pinnacle Quest International. PQI has provided it's products and services to nearly 100,000 people in over 33 countries. They have discovered this powerful information, and taken advantage of these little-known insider secrets. Our members hail from all walks of life and after 6 years of success, we continue to grow stronger. We deal with most every aspect of wealth creation and preservation. Our expert contributors are well known in thier areas of expertise, and have strong track records. Most have 10-18 years experience in thier specific field. These strategies and the education we provide has previously been only available to the ultra-wealthy or very well connected. What we have done is made this information and these experts available to clients like yourself. As you acquire this knowledge you will become a part of an elite group of individuals who are privy to the world's most exclusive, strategic financial information available today. I look forward to introducing you to this information.

## WHAT DOES IT COST AND HOW DO I GET STARTED!?

TO GET STARTED AND GET THE REST OF YOUR QUESTIONS ANSWERED:
READ THE INFORMATION BELOW, VISIT OUR MAIN WEBSITE, AND THEN CONTACT ME.
I WILL GET YOUR REMAINING QUESTIONS ANSWERED, GET YOU MORE INFORMATION IN WRITING, LET YOU HEAR FROM OTHER PQI CLIENTS ON HOW THEY HAVE BENEFITED, AND THEN GET YOU STARTED ASAP.
I LOOK FORWARD TO SPEAKING TO YOU.

Our Global I Package is only $1280.00 and includes:

1. The most exciting and shocking education you've ever had.


2. Extensive Continuing Education with the On-Line Resource Center.
3. Most importantly, unlimited consultations and support from the experts.
4. Access to PQI conference calls, updates, and continuing educational materials.
5. Joining a large team of like minded individuals set on true financial and personal freedom!

**Money Back Guarantee!**

**"It's amazing what you don't know untill you know..."**

## *ARE YOU STILL PAYING INCOME TAXES?*

Would you Like to be Tax Free for the Rest of Your Life?...provided you could do it Legally, Ethically, Irrefutably, Professionally, and most importantly ...Non-confrontationally!

Get ready to smile again! You are about to get an INSTANT PAY RAISE! Imagine if you never had to pay Income Tax again. What would you do with an extra $200, to $300 or more per week for life? How much would this be worth to you?...5K, 10K, 50K? Well it's a lot more than that... (just joking), the cost is minimal and it depends on which method is best for you. You see we offer at least half a dozen. But $1280.00 USD gives you access to everything. To put it in perspective: If you make 30K/yr. on average you pay 9-10K in taxes, every year. That money will be yours, and you can start putting it to work for you.

You can stop tax withholding from your paycheck in as soon as 30 days or less from joining IGP. Personally, I did it in less than 3 weeks, over 3 1/2 years ago.

*This simple web page has been set up to refer you to our main web sites so you can gather more information and make an educated desicion about what we have here. When you are ready to get started or to get your questions answered, my contact info. is on the left.*

If you are serious about looking into what you see here, you may call me anytime and I will be glad to get your questions answered, provide more information in writing, and introduce you to this phenominal product and group of experts...Pinnacle Quest International.

Literally, this is your beginning toward true financial and personal freedom and prosperity.

**PINNACLE QUEST**

*Mark D. Leitner*
*PQI Consultant*

**Web Site Resources and a few of PQI's Contributors:**

Becoming Legally Tax Exempt
www.taxstatement.com

IRS CodeBusters
www.irscodebusters.com

Former Revenue Agent Bill Benson
www.16thamendment.com

Congressman Ron Paul

Ex-IRS Agent, CPA, Joe Banister

Ex-IRS Agent, CPA, Sherry Jackson

Ex-IRS Agent John Turner

Researcher, Ed Griffen, author of the Creature from Jeckyl Island. A book which exposes the truth about the "Federal" Reserve Bank 

Prosperously yours,
Mark Leitner
Member PQI & IFEA

7 min. Product Overview: 850.654.7727 x2002

**Contact Me**

*Name:* Mark Leitner

*Email:* betaxexempt@yahoo.com

*Office Phone:* Toll Free: 866-BE-TAX-EXEMPT

**HOW MUCH YOU WILL SAVE IN TAXES ....EACH YEAR!**

(based on average yearly earnings)

| YEARLY INCOME | | TAXES SAVED |
|---|---|---|
| $20,000 | = | $5,600+ |
| $30,000 | = | $9,500+ |
| $40,000 | = | $12,500+ |
| $50,000 | = | $14,000+ |
| $75,000 | = | $22,000+ |
| $100,000 | = | $31,000+ |
| $150,000 | = | $45,000+ |
| $200,000 | = | $60,000+ |

**JUST DO THE MATH!!**

**WHAT KIND OF PEOPLE HAVE SPOKEN AT OUR SEMINARS?**

Ex-IRS Agent Joe Banister
Ex-Revenue Agent Bill Benson
Congressman Ron Paul of Texas
Former Judge John Rizzo
Muhammad Ali
International Finance Experts
a Former CIA member
World Class Author, G. Edward Griffen
Dr. Len Horowitz
many, many more.....

**WHO USES THIS INFORMATION?**

This information is used and promoted by Ex-IRS agents, CPA's, Judges, Attorney's, and Financial Planners. It is used by thousands of professionals and tens of thousands of regular people. Call anytime and ask to speak to some of them. They'll share their experience with you. We are so sure that this information will revolutionalize your financial world, that we offer an unconditional money back guarantee. If for any reason you are unimpressed, your money will be promptly refunded. Quite frankly, what do you have to lose?

## *FILING A TAX STATEMENT*

One particular method for eliminating income taxes, "filing a tax statement" in lieu of a tax return, is one of our more popular strategies and is the main theme of this site. Using existing IRS codes and procedures, a client will no longer have to file an income tax return or pay state/federal income taxes. We also help clients stop any tax withholdings from thier paychecks thus giving them an instant pay raise. They are legally and ethically removed from the tax system forever. Approximately 85% of Americans qualify for this particular tax strategy. Your Accountant or CPA cannot provide this for you. They are either unaware or grossly misinformed in this area. To find out if you qualify, contact me and / or visit the links below.
Click to hear from a CPA who researched and uses the "tax statement".

## SKEPTICAL?

**DOWNLOAD & LISTEN TO POWERFUL TESTIMONIALS ON THE REALITY OF BECOMING TAX EXEMPT.**

(Downloads may be up to 30min. w/56K modem)

1. **Shawn, CPA in Atlanta, Mother is IRS Agent.**
2. **John, 28 yr. PA State Lobbyist, Proof from IRS.**
3. **Les, Researched this in D.C. w/ IRS Head Attorney**

4. Jim, Ex-Police Officer, Saved 120K in back Taxes.
5. General Overview of the "Tax Statement" Package.

Also visit the Freedom Law School.
View the Caliber of Seminar Speakers that have attended these seminars to share with you the truth about taxation and your freedoms.
Just click on the picture.







File Edit View Favorites Tools H
Address http://pqi.cc/intromain.cfm
Back Search Favorites History
Alexa Search Site Info Rank: 1,117,219 Related Links Tell a Friend

PINNACLE QUEST
Project FREEDOM
US Representative Ron Paul of Texas
Menu
Opening Page
Search Project Freedom
E-Communications
A Biography of Ron Paul
Texas' 14th District
Committees
Constituent Services
Ron Paul's Legislation
Cosponsors of Legislation
Privacy Forum
Press Releases
Weekly Column
Speeches
Legislative Update Line
Freedom Watch
Welcome to
TUESDAY, AUGUST 6, 2002
Project FREEDOM!
Ron Paul, M.D.
Member of Congress
I am pleased to host this website as
my constituents in the 14th District
for Americans everywhere who cher
of liberty, fiscal integrity and constit
government.
There is a great deal of information
the site, which can be accessed using
menu. Of course, here you can find
how to contact my offices electronic
telephone or regular mail. Due to sa
procedures put into place as a resul
anthrax attacks, mail delivery and
been substantially delayed. My staf
apologize for any inconvenience thi
Thank you for visiting Project FRE
In Liberty,
Introduction
Products
Resources and Links
Career Opportunities

EXHIBIT
5