# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

FILED OCT 2 6 2004
Phil Lombardi, Clerk
U.S. DISTRICT COURT

ENTERED ON DOCKET
DATE OCT 2 6 2004

DAVID WAYNE STARKEY,
an individual,

    Plaintiff,

vs.

DAVID STRUCKMAN, et al.,

    Defendants.

Case No. 02-CV-951 K (J)

## REPORT AND RECOMMENDATION

The Court held evidentiary hearing on October 14, 2004 on the reserved issue of what damages, if any, should be awarded to Plaintiff pursuant to motion for summary judgment, and the Court, having considered the evidence, argument and authority submitted, enters the following report and recommendation:

### Background

On August 3, 2004, the undersigned issued a Report and Recommendation, recommending that summary judgment be granted in favor of the Plaintiff and against Defendants David Struckman, Pinnacle Quest International Inc., ("PQI"), and Synergy Productions International Inc., ("SPI"). Defendant Struckman filed purported entry of appearance and objection, which was stricken by the District Court by Order dated September 27, 2004 for failure to comply with court rules.

67

## Evidentiary Findings

Plaintiff's damage hearing, originally scheduled for August 20, 2004, was rescheduled for October 14, 2004. At the hearing on this cause, Plaintiff David Wayne Starkey appeared both personally and through his attorneys, lead counsel Thomas E. Kimble, Esq., and local counsel Adam Scott Weintraub, Esq. Defendants David Struckman, PQI, and SPI, although having been duly noticed to appear, failed to appear in any capacity.

Plaintiff David Wayne Starkey testified regarding his knowledge of the Defendants' business practices and of numerous conversations that he had with Defendant Struckman. Specifically, Plaintiff established the following through his testifimony:

1. By way of background, Mr. Starkey testified that he holds an 8th grade education and had suffered a closed head injury in his past. He testified that he has limited cognitive abilities, especially in comprehending longer reading passages and in following a chain of logic.

2. Mr. Starkey testified that on or about February, 1997, he began a business relationship with Defendant Struckman. Defendant Struckman became Plaintiff's mentor regarding the products and sales techniques used to sell tax shelters being marketed by Mr. Struckman and later by Defendants PQI and SPI, which Plaintiff later determined to be fraudulent. Plaintiff was unaware of the fraudulent and illegal nature of the investment vehicles promoted by Mr. Struckman, PQI, and SPI.

3. The Defendants and each of them offered "seminars" providing tax information regarding "common law trusts," "offshore trusts," and other tax shelters and tax havens. The first level of seminar is a tape seminar which sells for $1,250. The second level is an offshore seminar which sells for $6,250. These seminars were held at least two times a year and included paying audiences of at least 3000 people per seminar. The third level of seminar was a five day advance training "elite" seminar which sold for $18,750.

4. The organization of which Defendant Struckman was a principal originally went by the name of Global Prosperity. Plaintiff testified that Defendants PQI and SPI continue to offer seminars identical to those which have been offered by Defendant Struckman and Global Prosperity in the past. The focus of these seminars is to instruct individuals to move funds into a "tax free offshore trust" wherein Lloyds of London would purportedly insure the principal in its entirety.

5. Defendant Struckman would often show off his wealth as an incentive for people to become marketers and investors. Mr. Starkey testified to Defendant Struckman's practice of purchasing items by way of filling a brown bag with cash. The fact that Defendant Struckman is able to make such purchases of big ticket items, including but not limited to a yacht and a custom automobile, is used as a marketing technique to sell the seminars and investment products. Mr. Starkey further testified that Mr. Starkey personally witnessed Defendant Struckman's practice of "draining" multiple ATM's by successively removing all the cash contained in each.

6. Defendant Struckman represented to Mr. Starkey that he had made at least $15 million from the sale of Global Prosperity products. Mr. Starkey testified that this $15 million figure is based on a pink wire transfer slip Mr. Starkey held in his hand at a restaurant. Defendant Struckman showed Mr. Starkey the wire transfer as an apparent inducement both to invest in Global Prosperity offshore funds and to market Global Prosperity products. The assets of the various Defendants are and have been commingled to an extent that it would be difficult, if not impossible, to separate them out. Mr. Starkey testified that Defendant Struckman makes money not only from the sale of seminars but also takes 50% of the revenues required to establish the trusts and IBCs, which in turn are sold exclusively to seminar participants through persons or entities identified as "vendors" at the offshore seminars.

7. Plaintiff's testimony regarding the $15 million profits confirmed the independent estimate of the Justice Department that Struckman earned at least $5.1 million in profits from Global Prosperity [Doc. #56, Attachment, Page Four]. Plaintiff testified that the lower estimate was based on profits invested in domestic trusts only and therefore most likely excluded the majority of profits Struckman earned from Global Prosperity.

8. Plaintiff was looking for a business opportunity when he met with Defendant Struckman and quickly became a "poster boy" for Defendant Struckman. On numerous occasions, Defendant Struckman used Plaintiff's limited education and head injury as an incentive to others to market Global Prosperity products, boasting that anyone can be a success in a business that does not requires a "Harvard MBA."

Under Defendant Struckman's guidance, Plaintiff was unwittingly led, pressured, and ultimately coerced into selling and purchasing the various seminars and investment products offered by Defendants. Plaintiff testified that at one point, Defendant Struckman insisted that Plaintiff participate in Global Prosperity offshore investments; otherwise, Struckman would no longer work with Plaintiff.

9. Plaintiff testified that when he began his relationship with Defendants, he was under the belief that the products and investment vehicles he was selling and in which he was participating were bona fide. Defendant Struckman introduced Plaintiff to a man identified as John Rizzo whom Struckman claimed was a former Federal Judge and an expert in trust taxation. Struckman told Plaintiff to set up the trusts directly through John Rizzo, whom he represented was Struckman's expert on these matters. Struckman also introduced Plaintiff to two other individuals, Kenneth Wayne and Sharon Kukahn whom Struckman identified as "Federal Attorneys". These individuals gave advice on Global Prosperity tax shelters. None of these people has ever been admitted to any state bar association.

10. Defendant Struckman also stressed an ongoing relationship with a United States Congressman who was a featured speaker at a Global Prosperity advanced seminar. Struckman told Plaintiff that Congressman Ron Paul supported what Struckman and Global Prosperity were doing. Plaintiff testified that Congressman Paul's government website continues to be linked, although no longer hot linked, to this day to the official PQI website as a presumed marketing tool. Defendant

Struckman described Congressman Paul to Plaintiff as a Global Prosperity "contributor."

11. The trust agreements were complex documents with multiple tiers and were difficult to follow. Plaintiff testified that he believed everyone in Defendant Struckman's circle, including the advisors and seminar attendees, were "a lot smarter" than Plaintiff. One physician represented to Plaintiff that he had received a $250,000 tax refund due to the efforts of John Rizzo. None of the seminar participants, whom Mr. Starkey described as "high end" professionals seemed to question the legality of these supposed tax-exempt trusts. Mr. Starkey trusted Defendant Struckman and his representatives.

12. Mr. Starkey testified that his understanding changed in September of 1999. Mr. Starkey spoke of two telephone conversations he had with a licensed California attorney who advised him that the various investment vehicles and "tax havens" being offered by Defendant Struckman were bogus. The attorney further advised that John Rizzo was neither a former Federal Judge nor an expert in trust taxation. Rizzo's only link to a court of law was Rizzo's previous administrative position as a bail bondsman. The attorney further advised Plaintiff that other individuals who had been identified as "federal attorneys" were not attorneys or members of any bar association. The attorney also told Mr. Starkey that the investment vehicles he had established were not tax exempt as Struckman and Rizzo had represented and that this had been legally determined. Essentially, everything that Plaintiff had been led to believe by Defendants was revealed to be a sham.

13. When Plaintiff approached Defendant Struckman regarding his concerns about the legality of Struckman's tax avoidance products, Defendant Struckman replied, "keep your mouth shut." Further, Defendant Struckman threatened Plaintiff's family with injury. Mr. Starkey took these threats quite seriously as another associate of Defendants had died under unusual circumstances.

14. Plaintiff testified that he eventually came forward with information against Defendant Struckman and Global Prosperity's bogus tax avoidance products. In response, Defendant Struckman established a website to discredit Mr. Starkey. This website included various untrue defamatory statements including charges of extortion and embezzlement allegedly perpetrated by Mr. Starkey. Mr. Starkey presented evidence that these defamatory comments cost Mr. Starkey at least $13,500 in lost income.

15. Mr. Starkey testified that Defendants Struckman, PQI, and SPI are continuing to sell bogus offshore trusts and continuing to offer their seminars.

16. Mr. Starkey described conversations he had on August 16 and August 17 of 2004 with two PQI consultants who approached Mr. Starkey believing Mr. Starkey was considering purchasing PQI products. Mr. Starkey was referred to a website which he reviewed only to discover that the common law trusts offered for sale were identical in all material respects to the trusts previously offered by Struckman and Global Prosperity. Further, one of the retailers represented that Mr. Starkey could discuss PQI tax avoidance strategies with a person identified as "Sharon" their "Federal lawyer."

17. On August 17 of 2004, Plaintiff spoke with a PQI consultant who confirmed that Defendant Struckman continues to operate PQI from the Republic of Panama, despite an outstanding arrest warrant directly related to Defendant Struckman's activities in establishing bogus offshore trusts. Mr. Starkey testified that Struckman had earlier represented to Mr. Starkey that Struckman had started PQI and SPI as International Business Corporations (IBC's), and had told Mr. Starkey in detail how one could use IBC's to prevent creditors from reaching assets in a type of "shell game" whereby the assets were sufficiently commingled to prevent their separate identification.

18. Starkey additionally offered testimony in accord with the affidavit of Allen Self, Ph.D., previously offered into evidence [Doc. #16, Exhibit E]. Mr. Starkey testified regarding $35,000 he invested into a trust established by John Rizzo. The entire $35,000 was lost. The sum was not insured by Lloyds of London, or by any other insurance company, as he had been told. Mr. Starkey additionally lost sums totaling $20,700, $15,705, and $15,000 in other failed investment vehicles which had been perpetrated upon him by Defendant Struckman. In addition to these sums, Plaintiff paid a total of $51,000 for admission to Defendants' various seminars. Further, because of the defamatory comments which had been made by Defendants regarding Mr. Starkey, he lost a commission of $13,500. All told, Plaintiff suffered out-of-pocket losses in the amount of $150,905.

## Conclusions

The Court finds Plaintiff has met his burden of proof and is entitled to actual and punitive damages. The Court finds Plaintiff is entitled to recover $150,905 in actual damages.

As to punitive damages, the Court finds Defendant Struckman acted intentionally and with malice, and performed these intentional and wrongful acts without just cause or excuse. The financial benefit Defendant Struckman derived from his wrongful conduct caused harm to Plaintiff and others.

The Court further finds all Defendants are engaged in socially illicit activity without any redeeming social value, that Defendant Struckman continues to run PQI and SPI from Panama despite an outstanding arrest warrant directly related to Mr. Struckman's improper tax strategies, and that disgorgement of economic gains is the only remedy that makes economic sense. The Court concurs with Plaintiff's request for punitive damages in the amount of $4,500,000 and finds this amount is appropriate to deter these Defendants and others from engaging in similar wrongful conduct within the State of Oklahoma. The Court further finds the assets of Defendants David Struckman, PQI, and SPI were sufficiently commingled to prevent their separate identification.

Accordingly, the Court recommends judgment be entered in favor of Plaintiff and that Plaintiff, David Wayne Starkey recover from Defendants David Struckman, Pinnacle Quest International, Inc., and Synergy Productions International, Inc.,

judgment in the amount of $150,905 actual damages, and $4,500,000 punitive damages, for a total damage award of $4,650, 905.

Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation. Objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma within 10 days of being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 6 (as to computation of time periods). If specific written objections are timely filed, the district judge assigned to this case will

> make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b). *See also* 28 U.S.C. § 636(b)(1).

The Court of Appeals for the Tenth Circuit has adopted a "firm waiver rule" in connection with appeals from orders adopting a Magistrate Judge's report and recommendation. "[T]he failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). **Thus, a timely, specific and written objection is necessary to preserve an issue for *de novo* review by**

the assigned district judge and for appellate review by the court of appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Haney v. Addison*, 175 F.3d 1217 (10th Cir. 1999); and *Talley v. Hesse*, 91 F.3d 1411 (10th Cir. 1996).

IT IS SO ORDERED THIS 26 DAY OF OCTOBER, 2004.

Sam A. Joyner
United States Magistrate Judge

CERTIFICATE OF SERVICE
The undersigned certifies that a true copy of the foregoing pleading was served on each of the parties hereto by mailing the same to them or to their attorneys of record on the 26 day of October, 2004.